# EXHIBIT A

**Nokia Siemens Networks**

Contract Number C-1111-0500

# MASTER SERVICES AGREEMENT

## BETWEEN

## NOKIA SIEMENS NETWORKS US LLC

### AND

## ADVANCED TECHNOLOGIES AND INSTALLATION CORPORATION D/B/A TELECOM NETWORK SPECIALISTS

**Nokia Siemens Networks US LLC Confidential**

1 OF 62




**Nokia Siemens Networks**

Contract Number C-1111-0500

## TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS ................................................................................... 3
ARTICLE 2 - PURPOSE OF THE MSA ................................................................... 7
ARTICLE 3 – PURCHASE ORDERS ...................................................................... 8
ARTICLE 4 - CHANGES ......................................................................................... 9
ARTICLE 5 - ACCEPTANCE PROCEDURES ........................................................ 10
ARTICLE 6 - TNS'S OBLIGATIONS ...................................................................... 11
ARTICLE 7 - PROJECT MANAGEMENT ............................................................... 14
ARTICLE 8 - LOGISTICS ....................................................................................... 15
ARTICLE 9 – TRAINING, LICENSING AND SERVICE EXCELLENCE PROGRAM ...... 16
ARTICLE 10 - QUALITY ASSURANCE .................................................................. 17
ARTICLE 11 - PRICE AND PAYMENTS ................................................................. 18
ARTICLE 12 – AUDIT RIGHTS ............................................................................. 20
ARTICLE 13 – MECHANICS LIENS ....................................................................... 21
ARTICLE 14 – WARRANTIES ................................................................................ 22
ARTICLE 15 – PERFORMANCE BOND ................................................................. 23
ARTICLE 16 - INDEMNITIES ................................................................................. 24
ARTICLE 17 - DAMAGES ...................................................................................... 25
ARTICLE 18 - INSURANCE ................................................................................... 25
ARTICLE 19 - DOCUMENTATION ........................................................................ 25
ARTICLE 20 - DELAYS .......................................................................................... 26
ARTICLE 21 - TERM AND TERMINATION ........................................................... 26
ARTICLE 22 - FORCE MAJEURE .......................................................................... 29
ARTICLE 23 - INTELLECTUAL PROPERTY RIGHTS ........................................... 29
ARTICLE 24 - CONFIDENTIAL INFORMATION ................................................... 30
ARTICLE 25 - COMPLIANCE WITH FEDERAL REGULATIONS............................ 32
ARTICLE 26 – AFFIRMATIVE ACTION ................................................................. 33
ARTICLE 27 – DISPUTE RESOLUTION................................................................ 34
ARTICLE 28 – GENERAL PROVISIONS................................................................ 35

Appendix 1 - Subcontractor Requirements for Services.......................................... 39
Appendix 2 – Waste Management Guidelines.......................................................... 50
Appendix 3 - Service Excellence Program .............................................................. 52
Appendix 4 - Final Waiver of Lien .......................................................................... 55
Appendix 5 – Release and Certificate of Payment.................................................. 56
Appendix 6 - Contractor's Affidavit......................................................................... 58
Appendix 7 - Insurance Requirements..................................................................... 59
Appendix 8 - MBE/WBE/DVBE Reporting .............................................................. 62


Nokia Siemens
Networks

Contract Number C-1111-0500

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("MSA") made and entered into this 20th day of May, 2007 (the "Effective Date") by and between **Advanced Technologies and Installation Corporation d/b/a/Telecom Network Specialists,** incorporated in the State of **Washington**, with offices located at 655 N. Glenville Drive, Richardson, TX 75081 ("TNS"), and Nokia Siemens Networks US LLC, a Delaware limited liability company with offices located at 1040 Crown Pointe Parkway, Suite 900, Atlanta, GA 30338 ("**NSN**").

### BACKGROUND

By this MSA, **TNS** agrees to provide Services to **NSN** and on behalf of **NSN** to **NSN** customers (individually, a "Customer") under the terms and conditions hereinafter set forth.

**NSN** has been engaged by telecommunications network operators, under the terms of purchase and sale agreements (individually, the "Customer Contract"), to supply telecommunications infrastructure and related Services. **NSN** makes no representations or assurances hereunder that **TNS** will be retained to perform said Services.

This MSA shall govern the performance of all Services by **TNS** in connection with projects for Customers, as amended by Attachments attached hereto which reflect particular Customer terms and requirements. Attachments shall govern over this MSA. Attachments shall in conjunction with this MSA be deemed independent contracts, and the terms of each Appendix shall have no relation to another Attachment.

Should **TNS** execute this MSA and Appendices related to Customer projects when issued, and **NSN**, at its sole discretion, award the performance of Services to **TNS**, then Services shall be performed by **TNS** under the terms of this MSA and the applicable Amendments .

**TNS** understands that its performance under this MSA is intended to support **NSN** and satisfy the obligations and liabilities of **NSN** to Customer under the applicable  Customer Contract.

Accordingly, the Parties agree as follows:

## ARTICLE 1 - DEFINITIONS

In all interpretations of this MSA, the following terms shall have the meanings set forth below:

1.1   "Accept" or "Acceptance" shall have the meanings defined in Article 5, "*Acceptance Procedures,*" of this MSA and in the applicable Attachments.

1.2   "Affiliate" of a Party shall mean an entity

    (a)   which is directly or indirectly controlling such Party;

    (b)   which is under the same direct or indirect ownership or control as such Party; or

    (c)   which is directly or indirectly owned or controlled by such Party.

For these purposes, an entity shall be treated as being controlled by another if that other entity has fifty percent (50%) or more of votes in such entity, is able to direct its affairs and/or to control the composition of its board of directors or equivalent body.



Contract Number C-1111-0500

1.3   "Appendix" shall mean terms, conditions and requirements of a particular Customer, as stated in a document entitled an Appendix and attached to this MSA upon or after the Effective Date, with which **TNS** must comply in performing any Services in connection with a project for that Customer.

1.4   "As-Built Drawings" shall mean drawings which accurately reflect the configuration of the Equipment following completion of the Service activity at a Site. As-Built Drawings shall be as described in the applicable Attachments.

1.5   "Changes" or "Change Order" shall have the meanings defined in Article 4, "*Change Orders.*"

1.6   "Commission" or Commissioning" shall mean all activities related to the configuration of Equipment in preparation for connection to other Equipment, and includes the testing of a piece of Equipment isolated from other Equipment.

1.7   "Confidential Information" shall have the meaning set forth in Article 24, "*Confidential Information.*"

1.8   "Customer" shall have the meaning defined in the section above entitled "Background."

1.9   "Customer Contract" shall have the meaning defined in the section above entitled "Background."

1.10  "Day" shall mean any calendar day including any Saturday and Sunday, and any public or bank holiday.

1.11  "Effective Date" shall have the meaning defined above in the section entitled "Background."

1.12  "Equipment" shall mean all hardware and software (together with the necessary software manuals and other equipment specific documentation) provided by **NSN** to **TNS** in connection with Installation at a Site.

1.13  "Install" or "Installation" shall mean the activities required to install the Equipment as described in the relevant Installation Manuals.

1.14  "Integrate" or "Integration" shall mean the activities necessary for the Equipment to be configured and connected to the System.

1.15  "Master Services Agreement" shall mean this Master Services Agreement as defined in the section above entitled "Background," including all Appendices, Amendments, and Attachments, attached hereto, and any Appendices, Amendments, and/or Attachment that may subsequently be agreed upon by the Parties. Where appropriate, references herein to the "Master Services Agreement" or "MSA" shall be deemed to include the applicable Appendices, Amendments, and Attachments.

1.16  "Material" shall mean hardware and software (together with the necessary software manuals and other equipment specific documentation) supplied by **TNS** and to be installed at Site, including, without limitation, materials and consumables that are necessary to install the Equipment. Additional required Materials may be specified in an Amendment and/or Attachment.

1.17  "Network Planning" shall mean, as more fully described in the applicable Amendment and/or





Nokia Siemens
Networks

Contract Number C-1111-0500

Attachment, all services and activities necessary to plan the technical solution for the System and each component thereof within a Zone, including radio frequency engineering and both the cellular and transmission network layout.

1.18 **"NSN Information"** shall mean any and all information and documents made available to **TNS** in connection with Services including, but not limited to, **NSN**'s and/or the Customer's technical, financial and commercial information and data relating to their respective businesses, finances, planning, facilities,  products, techniques and processes including, but not limited to, **NSN** Intellectual Property, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, tracings, diagrams, models, samples, flow charts, data, computer programs, disks, diskettes, tapes, marketing plans, customer  names and other technical, financial or commercial information, whether or not **NSN** or Customer have any intellectual property rights in such information, and whether in writing or other tangible or in oral form.

1.19 **"NSN Intellectual Property"** shall mean copyrights, trade names, trademarks, trademark applications, service marks and United States or State registrations thereof and any foreign registrations, trade names, United States and foreign patents and patent applications, copyrights, Internet websites, domain names, know-how, trade secrets, confidential information, customer lists, technical documentation, technical information, data, technology, plans, drawings, schematics, compilations, devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, used by **NSN** or its affiliates or as to which **NSN** or its affiliates claim or could claim an ownership interest or as to **NSN** or its affiliate is a licensee or licensor.

1.20 "Order" shall mean a Purchase Order or a Change Order as defined herein.

1.21 "Party" shall mean **TNS** and **NSN**, individually. "Parties" shall mean **TNS** and **NSN**, collectively.

1.22 "Permitting" shall mean the obtaining of necessary authorizations from public (national and local) authorities for deployment of the System (or a part thereof), including, but not limited to, permits required for services ordered in the Attachments.

1.23 "Pre-Existing Materials" shall mean tools, know-how, methodologies, processes, technologies or algorithms used in performing the Services which **TNS** can demonstrate are based on trade secrets or proprietary information of **TNS** or have been licensed to **TNS**.

1.24 "Project Management" shall mean the management of Services to be performed within a Zone by **TNS**, if ordered, and as defined in the relevant Appendices, Amendments and/or Attachments attached hereto or subsequently attached hereto.

1.25 "Purchase Order" shall have the meaning defined in Article 3, "*Purchase Orders.*"

1.26 "Services" shall mean the services and Material described in an Order, this MSA, and the applicable Amendment and/or Attachment. Services shall be performed and delivered by **TNS** in accordance therewith.

1.27 "Site" shall mean a cell site and/or each physical location where Equipment has been or will be installed, or location where Services are to be performed.

1.28 "Site Acquisition" shall mean all activities related to the rental, purchase or other arrangement for use of a physical location as a Site as further defined in an Amendment and/or Attachment.





Contract Number C-1111-0500

1.29  "Site Audit" shall mean the inspection of a Site to collect knowledge of the conditions existing at the Site and its surroundings including, but not limited to, the status of existing equipment at the Site, access to the Site, permitted working hours, power and transmission availability, Equipment lay-out, building rooftop and roof structures. Further Site Audit requirements may be provided for in an Amendment and/or Attachment.

1.30  "Site Owner" shall mean the person(s) or entity actually or potentially leasing (or otherwise making available) the physical space for use as a Site for the System.

1.31  "Site Ready" shall mean the completion of **TNS**'s responsibilities with respect to a Site as further specified in an Order, this MSA, and the applicable Amendment and/or Attachment.

1.32  "Specifications" shall mean all **NSN** or Customer requirements and specifications for Equipment, Services, and/or Material.

1.33  "**TNS** Information" shall mean any **TNS** technical, financial, algorithms, software, engineering techniques, and commercial information, including any of the foregoing that may be independently developed by **TNS** in the course of performing the Services, which has been specifically identified to **NSN** in writing as being confidential.

1.34  "System" shall mean the communication system to be built and operated by Customer in the Territory.

1.35  "Telecom Implementation" shall mean, as more fully described in this MSA and the applicable Amendment and/or Attachment, the execution of all Services to be carried out and the supply of Material required in order to deliver to the Sites, and Install and Integrate the Equipment, so that is fully functions as part of the System.

1.36  "Territory" shall mean the United States of America, Puerto Rico, Canada, the Virgin Islands, and the other English Caribbean Islands, and as may otherwise be defined in an applicable Amendment and/or Attachment.

1.37  "Time for Completion" shall mean the date or dates (as the case may be) specified in the project plan by which **TNS** must complete performance of the Services.

1.38  "Works" or "Work" means the Work/Services priced and described in an attached Amendment and/or Attachment.

1.39  "Working Day" shall mean any day where work has been regularly scheduled, with the exception of a local public holiday observed in the Zone.

1.40  "Works Ready" shall mean completion of the Services on an individual Site or Scope of Work by **TNS** as stated in this MSA and the applicable Amendment and/or Attachment so that the Parties can commence the Acceptance Procedure described in Article 5, "*Acceptance Procedures.*"

1.41  "Zone" shall mean each geographical area within the Territory wherein are or will be located multiple clusters of Sites and within which the Services will be performed by **TNS** as specified in this MSA and the applicable Amendment and/or Attachment.

**ARTICLE 2 - PURPOSE OF THE MSA**


**Nokia Siemens Networks**

Contract Number C-1111-0500

2.1  <u>Purpose.</u> The purpose of this MSA is to define the terms and conditions under which **TNS** shall perform the Services by the terms and conditions of the applicable Amendment and/or Attachment. Subject to individual Orders submitted by **NSN**, **TNS** shall, to the extent ordered by NSN and such Orders accepted by **TNS**, perform and deliver (as the case may be) the Services. A detailed description of the Share of Responsibilities of the Parties in respect of Services is contained in the applicable Appendix, Amendment and/or Attachment.

2.2  <u>Customer Contract.</u> The Parties acknowledge that the Services are being performed in support of **NSN**'s obligations and responsibilities towards a Customer, and are an integral part of the goods and services provided by **NSN** to the Customer. Accordingly, **TNS** shall comply with the time schedule, Time for Completion, performance and quality standards, specifications and other requirements specified in the applicable Appendix, Amendment and/or Attachment and this MSA.

2.3  <u>Governing Order.</u> The terms, conditions, and requirements of an Amendment and/or Attachment shall prevail over the terms, conditions, and requirements of this MSA to the extent of any conflict between them. Each Appendix, Amendment and/or Attachment shall prevail over the documents referenced in said Appendix, Amendment and/or Attachment.

2.4  <u>Additional Terms and Conditions.</u> **TNS** acknowledges that, since Customer Contracts may be entered into in future, **NSN** cannot presently share with **TNS** all terms and conditions which will govern the performance of Services by **TNS**. Furthermore, **TNS** acknowledges that **NSN** may require **TNS** to accept amendments to this MSA in the future.  Accordingly, the Parties agree to the following procedures for acceptance of same.

   (a)  **NSN** may, at any time, make available to **TNS** an Appendix, Amendment and/or Attachment containing terms, conditions, and requirements for the performance of Services in connection with a particular Customer project. Acceptance of the Amendment and/or Attachment shall be subject to this Article 2.

   (b)  In addition, **NSN** may from time-to-time require that **TNS** accept additional or modified requirements, or terms and conditions, that amend this MSA ("Additional Terms") including, without limitation, terms relating to performance requirements, specifications, liabilities, indemnities, warranties, and bonding requirements. Acceptance of Additional Terms by **TNS** shall be subject to this Article 2. Additional Terms or parts thereof are hereafter referred to collectively as " Appendices and/ or Amendments."

   (c)  All such Appendices and/ or Amendments shall be sent by **NSN** to **TNS** in accordance with the Notice provisions of Article 28, "*General Provisions*," paragraph 28.4. Within ten (10) Working Days following its receipt of an Appendix or Amendment from **NSN**, **TNS** may, by written notice to **NSN**, object to any such Appendix or Amendments. **TNS** will be deemed to have accepted all such Appendix or Amendments to which it does not timely object as provided above, and such Appendix or Amendments will amend the terms of this MSA. Appendices and/or Amendments should thereafter be properly executed by **TNS** as a formality.

   (d)  If **TNS** does timely object to any of such Appendix or Amendment as provided above, then the Appendix or Amendment to which **TNS** did not object will amend the terms of this MSA and the Parties will meet to discuss the Appendix or Amendment to which **TNS** did object. The Parties will designate representatives who have the authority to agree upon such Appendix or Amendment, and such representatives will meet within five (5)




Nokia Siemens
Networks

Contract Number C-1111-0500

Working Days following **NSN**'s receipt of **TNS**'s written objection. If, within ten (10) Working Days following **NSN**'s receipt of **TNS**'s objection, the Parties do not reach agreement regarding such Appendix or Amendments to which **TNS** objected in writing, then **NSN** may terminate any or all Orders, Appendices, Attachments, and/or this MSA itself under the Termination for Convenience provisions of Article 21, "*Term and Termination*", paragraph 21.4 of this MSA.

2.5    Management of Services. **TNS** shall be responsible for performance and management of its Services at the Sites and within a Zone. A description of the Share of Responsibilities between the Parties with respect to the Services shall be contained in the applicable Appendix and/or Amendment and/or Attachment.

2.6    Entire Understanding. This MSA and applicable Appendices, Amendments and Attachments contain the entire understanding between the Parties regarding the Services. All previous correspondence and documents exchanged between the Parties in respect of the Services performed in connection with an Appendix, Amendment, and/or Attachment prior to the Effective Date are superseded by this MSA.

## ARTICLE 3 - PURCHASE ORDERS

3.1    Submission. **NSN** shall order Services in accordance with this MSA, by issuing Purchase Orders to **TNS** for the supply of all applicable Services, subject to mutually acceptable terms accepted by both Parties under this MSA. Further definition of the Purchase Order process will be defined in the relevant Appendix and /or Amendment and/or Attachment. **TNS** acknowledges and agrees that **NSN** has no obligation to order Services from **TNS** and that **NSN** may have third parties perform the same or similar Service as the Services, ordered to **TNS** including within any Zone. **TNS** shall only perform the Services specified in a Purchase Order. No other Service or Work shall be performed by **TNS** and **NSN** will not compensate **TNS** for the performance of any such Services or Work or bear any cost, direct of indirect, that may accrue as a result. **TNS** shall not receive additional payment for Services or Work outside the Scope of Work unless **NSN** approves the Work in accordance with the process described in Article 4, "*Changes.*"

3.2    All Purchase Orders issued by **NSN** shall be subject to mutually acceptable terms accepted by both Parties under this MSA. TNS shall accept or reject such Purchase Orders within five (5) Working Days upon the receipt of Purchase Orders. If TNS has not either accepted or rejected the Purchase Order within five (5) Working Days upon its receipt, such Purchase Order shall be deemed accepted by TNS. **TNS** agrees to fulfill all accepted Purchase Orders placed by **NSN** under the terms of this MSA and its Appendices, Amendments, and/or Attachments. The Purchase Order(s) may contain the following information:

(a)    Purchase Order Number and Date;
(b)    Scope of Services ordered;
(c)    Technical Drawings and Specifications not already included in the MSA or an Amendment and/or an Attachment, if applicable;
(d)    Site(s) locations; and
(e)    Value of the Purchase Order.

3.3    Performance. **TNS** shall only perform those Services that have been specified in an Order. No other Services shall be performed by **TNS** and **NSN** will not compensate **TNS** for the performance of any such Services or bear any cost or expense, whether direct or indirect, that may accrue as a consequence thereof.



Contract Number C-1111-0500

3.4 No Changes. Except as provided in Article 4, "*Changes*," **TNS** shall not make any changes or otherwise vary or alter any part of the Services.

3.5 Time Schedule. **NSN** shall provide to **TNS** a monthly rolling forecast for informational purposes only. **NSN** shall endeavor to provide **TNS** as much lead time as possible to mobilize for a new project. However, **TNS** shall be required to mobilize for a new project within the time specified in the relevant Order.

3.6 MSA Controls. The terms of this MSA and the applicable Appendix, Amendment and/or Attachments shall control over any Order submitted hereunder.

## ARTICLE 4 – CHANGES

4.1 Definitions

For the purpose of this Article 4, a "*Change Request*" is a document issued by **NSN** or **TNS** to the other Party defining Works which to be performed which are purportedly not included in within, nor priced, in the Appendices.

A "*Change Order*" is defined as a document issued by **NSN** to **TNS** defining, and pricing, an additional scope of work not previously included in the Appendices and a direction to proceed with the additional Works.

4.2 Changes Requested by **NSN**.

(a) Subject to paragraphs (b), (c), and (d) below, **NSN** shall be entitled to direct, at any time during the performance of this MSA, a change to the general scope of this MSA, including a Change that will add or delete Works to or from the Work, or affect any of the Completion Dates.

(b) Any Change directed by **NSN** shall be submitted in writing to **TNS** a "Change Order Request." **TNS** shall respond to a Change Order Request in writing to **NSN** within two (2) Working Days after receipt and shall include in such response the details of the impact of such change on prices and/or Completion Dates. In the event **TNS**, using its commercially reasonable efforts, cannot prepare such details within two (2) Working Days, **TNS** shall submit, prior to the expiration of the two (2) Working Day period, a request for an extension of up to five (5) Working Days or such period of time which is reasonable under the circumstances. Subject to **NSN**'s concurrence, **TNS** will be granted such extension.

(c) If **NSN** and **TNS** agree to **TNS**'s proposed change in the price(s) and/or Completion Dates caused by **NSN**'s change, **TNS** shall proceed with the performance of the Work as changed, immediately upon the issuance of a Purchase Order.

(d) If the Parties cannot agree to the proposed change(s) to the prices and/or Completion Dates, **NSN** may elect to issue, in **NSN**'s sole discretion, a change directive for such additions or changes. In the event **NSN** elects to issue such change directive, **TNS** shall proceed with the Work in accordance with the change directive and **NSN** shall pay **TNS** the amounts determined by NSN pending resolution of the matter as provided in Article 27, *Dispute Resolution*.

9





4.3     Changes Requested by **TNS**

    (a)    Subject to paragraphs (b) and (c) below, **TNS** may request, during the performance of the Work, any change within the general scope of the Work, including any change that will add or delete a Work, cause a revision to any Completion Date or affect any other requirement of this MSA.

    (b)    Any changes requested by **TNS** shall be submitted in writing to **NSN** at least five (5) calendar days prior to the proposed date of the change, or upon such notice as is reasonable under the circumstances based on the complexity of change and impact on pricing.  If such **TNS** requested change causes an impact in the Work, increase or decrease in prices, change in Completion Dates or other terms of this MSA, **TNS** shall submit, with such request, a written proposal identifying such change and the impact thereof on the Work, prices, Completion Dates or other terms of this MSA.

    (c)    **NSN** may accept or reject such request at **NSN**'s sole discretion.  **NSN** shall notify **TNS** within five (5) Working Days after receipt of the requested change proposal, or within such period as is reasonable under the circumstances whether or not **NSN** concurs with, and accepts, such change and the impact thereof. If **NSN** concurs, and accepts, **TNS**'s requested change and such impact thereof, **TNS** shall proceed with the performance of the Work subject to the prior issuance of a Purchase Order by **NSN**.  If **NSN** does not concur, **TNS** shall continue performance in accordance with this MSA without regard to such requested Change.

    (d)    **TNS** acknowledges that multiple change requests will have a material adverse effect on successful completion of the Work and/or meeting the Completion Date within the terms of this MSA.  Accordingly, **TNS** will use commercially reasonable efforts to (i) evaluate carefully the Scope of Work and make accurate and up-to-date representations to **NSN** as to **TNS**'s capabilities to perform the Work (ii) maintain sufficient current and future technical personnel and resources needed to accomplish the Scope of Work for a Purchase Order on time and within budget, and (iii) bring the possibility of change requests to the attention of **NSN** at the earliest possible date, but in no event later that five (5) Working Days of the date **TNS** become aware of the possibility of a Change.

4.4     Price Schedule.  Notwithstanding anything to the contrary in this Article 4, in the event a Change in the Work requested under this Article 4 involves only an addition or deletion of specific Work to or from the Work, the price adjustment for such Change shall be the addition or deletion, as the case may be, of the Price for such Work set forth in the applicable Attachment , as amended. Such price adjustment shall not be disputable by the Parties

## ARTICLE 5 - ACCEPTANCE PROCEDURES

5.1     Procedures.  **NSN**'s acceptance of and payment for the Services shall be subject to acceptance procedures defined in the applicable Appendix, Amendment and/or Attachment. If a Service is subject to acceptance by Customer, then acceptance by **NSN** shall be contingent upon prior acceptance by Customer for that Service.  Such Services that are subject to acceptance by Customer shall be clearly identified in the Appendix to the MSA for such Customer.

5.2     Inspection. Upon receipt by **NSN** of the Works Ready notification from **TNS**, **NSN** will inform the Customer that all relevant Services are complete and ready for acceptance. Customer and/or **NSN**



may inspect the Service and/or check the associated Service documentation to verify that all Services have been performed and all required documents properly completed.

5.3    Acceptance. The date of acceptance by **NSN**, as evidenced in the **NSN** database (E-PM), shall constitute "Acceptance" of the relevant portion of the Services performed, and shall trigger commencement of the warranty period.

## ARTICLE 6 – TNS'S OBLIGATIONS

6.1    Cooperation. **TNS** will cooperate in good faith with **NSN** and any third party retained by **NSN** or Customer in connection with performance of the Services.

6.2    Governmental Consents. **TNS** shall, at its cost, obtain all governmental and/or local consents, permits, approvals, licenses, and work permits necessary for the performance of the Services and in order to comply with local laws, regulations and practices. To the extent that **TNS** is required to execute Permitting on behalf of either **NSN** or the Customer, then such Permitting shall be defined in the applicable Appendix, Amendment and/or Attachment.

6.3    Health and Safety. **TNS** shall carry out the Services with strict regard to safety and health, and shall comply with the provisions of all applicable local, state, and federal laws, rules, or regulations, as the same may be updated from time to time, including the following:

    (a)    Health and safety regulations;
    (b)    Environmental laws and regulations relating to protection of the environment, pollution control, product registration, hazardous materials and radio transmitting equipment;
    (c)    Any Site specific security and safety regulations;
    (d)    Building regulations (including applicable laws relating to zoning);
    (e)    Other statutory regulations; and
    (f)    Any other Customer and/or **NSN** requirements pertaining to the Services as set forth in this MSA or any Amendment and/or Attachment attached hereto.

6.4    Certificates. **TNS** shall obtain and maintain all necessary health and safety certificates as required by applicable law or any other applicable regulations or as reasonably required by **NSN**. Copies of said certificates shall, promptly upon request, be forwarded to **NSN**.

6.5    Security. **TNS** shall not knowingly assign work to an employee; agent or subcontractor whom **TNS** reasonably believes may pose a security risk or is likely to endanger the safety of others. **NSN** may request the removal or non-assignment of any **TNS** employee, agent, or subcontractor so long as such request is based on an identifiable and articulated concern and does not violate any federal, state, or local law or regulation. **TNS** shall use reasonable efforts to secure the work environment by preventing third parties from accessing the work and/or area.

6.6    Training. **TNS** shall, at its cost, train its employees and approved subcontractors with regard to the matters set forth in this Article 6 so as to ensure compliance with the said stipulations.

6.7    Delegation. **TNS** shall not use subcontractors in the performance of the Services without the prior written consent of **NSN**, which shall not be unreasonably withheld and will be issued as soon as reasonably possible and in no event more than fifteen (15) Working Days of **TNS**'s request. If **NSN** gives such consent, **TNS** shall not be released from its obligations under this MSA, nor create a contractual relationship between **NSN** and such subcontractor, and **TNS** will be responsible for the work and activities of any subcontractor providing services in connection with



this MSA, including the subcontractor's compliance with this MSA and applicable Amendments and/or Attachments. **NSN** reserves the right to review and approve the terms of agreements between **TNS** and its subcontractors prior to giving its consent. A condition precedent to granting such approval, **TNS** shall ensure that all of the provisions of this MSA between **NSN** and **TNS** flow down to all second and third tier subcontractors.

6.8   <u>Subcontractor Requirements</u>. As applicable, **TNS**'s subcontractors shall comply with the requirements set forth in Appendix 1, "*Subcontractor Requirements*."

6.9   <u>Personnel List.</u> **TNS** shall at all times keep an up-to-date list of persons and entities (including its subcontractors) involved in the performance of Services. Such list shall be provided to **NSN** upon acceptance of an Amendment and/or Attachment and thereafter on a monthly basis if changes occur to the personnel involved. **TNS** agrees to use reasonable commercial efforts to provide that said persons shall continue their involvement in the provision of the Services until all such Services have been completed (subject to reasonable and voluntary requests for reassignment, and similar matters), provided that staffing may change, in **TNS**'s discretion given the requirements of the Services at the relevant Site(s) or Zone(s), as applicable, unless said persons no longer work for **TNS** or for the relevant subcontractor. **NSN** may require that **TNS** immediately remove any person employed by **TNS** or by a subcontractor of **TNS** who fails to conduct them self in an appropriate manner, or is incompetent or negligent in the performance of his duties, or whose continued presence on the project is judged by **NSN** to be detrimental. Such person shall not be assigned again to the execution of this MSA except with the prior written consent of **NSN**. **TNS** shall immediately replace any removed person with a person of equal or superior qualifications. All costs and expenses incurred in connection with said removal and replacement shall be borne by **TNS**.

6.10   <u>Employees of **TNS** and Its Subcontractors.</u> Notwithstanding any degree of instructions given by **NSN** to or project management exercised over **TNS**'s personnel assigned to perform Services or other tasks under an Order, such personnel shall at all times be deemed to be the employees of **TNS** and under no circumstances shall a relationship of employer and employee be deemed to arise between **NSN** and the personnel of **TNS** or its subcontractors.

(a)   As an independent contractor of **NSN**, **TNS** does not have and shall not represent to anyone that it has any power, right, or authority to bind **NSN** or assume to create any obligation or responsibility, expressed or implied, on behalf of **NSN** or in **NSN**'s name, including, without limitation, making economic or financial commitments on **NSN**'s behalf. In addition to whatever other remedies **NSN** may have at law or in equity for breach of this Article 6, **NSN** shall have the right to immediately terminate any Order, this MSA, and any Appendix, Amendment and/or Attachment.

(b)   **TNS** warrants that its personnel are subject to the supervision of **TNS**, notwithstanding the obligation of such personnel to comply with any regulations or requirements of **NSN**. **TNS** shall have the sole responsibility to counsel, discipline, review, evaluate, set the pay rates of, and terminate employees.

(c)   **TNS** agrees that it shall have appropriate personnel available (at no cost to **NSN**) to manage interactions with staffing and handle and resolve employee relations issues as they arise, and that such personnel shall consult with **NSN** Human Resources management when such employee relations issues may affect **NSN**, its employees or its business.



(d)   **TNS** is responsible for fulfillment of any and all obligations and tasks of an employer that are provided for by any applicable laws or regulations. This includes but is not restricted to liability to fulfill and take care of all work permit issues, company and individual tax liabilities, social security and pension contributions. **TNS** shall be solely responsible for any and all Federal, State, local, worker's compensation, unemployment, and other mandated taxes and costs for such employees. **TNS**'s employees shall be properly insured in accordance with any applicable laws and regulations. **NSN** shall in no way be responsible for insuring the employees of **TNS**.

(e)   At any time during the term of this MSA, **TNS** shall, upon request of **NSN,** provide **NSN** with proof of fulfillment of above mentioned employer's obligations.

(f)   Prices agreed with **NSN** include full compensation for the costs related to the above mentioned obligations.

(g)   **TNS** recognizes and acknowledges that neither it nor its employees are eligible for or entitled to any employee benefits provided by **NSN** to its employees, including, but not limited to, medical and dental coverage, life insurance, bonuses, stock purchase plan, pension plan, 401k plan, long-term disability plan, or other benefits.

(h)   **TNS** agrees that it shall not discriminate on the basis of race, color, religion, gender, sexual orientation, age, national origin, disability, or status as a veteran in the recruitment of candidates or other work in connection with the performance of Services. **TNS** affirms that it is an equal opportunity and affirmative action employer and shall comply with all applicable Federal, State and local laws and regulations including, but not limited to, Executive Order 11246 as amended; the Civil Rights Act of 1964 as amended; the Age Discrimination in Employment Act; Americans with Disabilities Act; Equal Pay Act of 1963, and any other applicable Federal, State or local law prohibiting discrimination.

(i)   **TNS** shall have or adopt an Anti-Harassment Policy for its employees and those of its subcontractors that is acceptable to **NSN**, and shall distribute a copy of the policy to all such persons, and shall provide training to on the policy to same. **TNS** shall immediately and thoroughly investigate any and all complaints under the policy and shall take appropriate remedial action in response to such complaints.

(j)   **TNS** shall take all reasonable steps necessary to ensure that all **TNS** employees are authorized to accept employment in the United States, Canada or the Caribbean where the Work is to take place,  pursuant to the Immigration Reform and Control Act, as amended in the United States and comparable law and regulation in Canada and  the Caribbean, and shall comply with any and all regulation and laws relating to certification of employment authorization.

(k)   **TNS** shall ensure that its subcontractors comply with all provisions of this Article 6.

(l)   **TNS** shall hold harmless and indemnify **NSN** for any and all liability to the extent arising or resulting from **TNS**'s breach of any provision of this Article 6 or in connection with any claims by a **TNS** employee, an employee of a subcontractor, and any third party's claims arising hereunder, but excluding any liability or claims to the extent resulting from the acts or omissions of any NSN Indemnified Party.

6.11   <u>Transportation.</u> **TNS** shall provide to its employees a sufficient number of suitable vehicles to


Nokia Siemens
Networks

Contract Number C-1111-0500

transport personnel, and any **TNS** provided tools and materials to the work area(s).

6.12    <u>Tools and Premises.</u> **TNS** shall, when performing the Services, provide the tools and premises necessary to perform the Services, except as may be specified in the applicable Amendment and/or Attachment or Order, at its own cost.

6.13    <u>Disturbances.</u> During performance of the Services, **TNS** shall take into account and shall instruct its employees and those of subcontractors accordingly that all Services must be efficiently, professionally and diligently executed and in a quiet and tidy manner. Disturbance to Site Owners and others in the vicinity of the Sites shall be kept to a minimum.

6.14    <u>Compliance.</u> **TNS** shall, at its cost, comply with all applicable rules, laws, and regulations in performing the Services.

6.15    <u>Environmental Requirements.</u> Each Party shall ensure that it is environmentally responsible and observes all applicable environmental and waste management laws and regulations. In addition, **TNS** shall comply with the **NSN** "*Environmental Requirements*" set forth in Appendix 2, in addition to any other requirements of Customer contained in an Amendment and/or Attachment.

## ARTICLE 7 - PROJECT MANAGEMENT

7.1    <u>Points-Of-Contact.</u> The applicable Amendment and/or Attachment contains procedures (if any) for establishing points of contact and a working procedure to resolve any issues which may affect the progress of the Services.

7.2    <u>Weekly Reports.</u> If **NSN** so requests, **TNS** shall provide to the **NSN** Regional Project Manager information and written reports regarding the status of the Services on a weekly basis and in a format reasonably requested by **NSN**. Such reports shall be made available using tools and processes approved by **NSN**. Among other things, such reports shall summarize the weekly and cumulative progress of the Services, the invoices issued to **NSN** by **TNS** and the payments received from **NSN** by **TNS**.

7.3    <u>Progress Meetings.</u>

   (a)    Regular progress meetings between **NSN** and **TNS** will take place at a location and an interval to be determined by **NSN** and such meetings shall follow an agenda to be provided by **NSN** to **TNS** prior to the meeting taking place. No costs shall be charged by one Party to the other Party for such meetings, unless participation in said meetings is excessive and impacts performance of delivery of Services.

   (b)    **TNS** shall attend progress meetings between **NSN** and a Customer if and when requested by **NSN**. In such case, **NSN** and **TNS** shall in advance agree the direction, content and amount of information to be provided by **TNS** to the Customer prior to the meeting. All information exchanged on a daily basis between **NSN** and **TNS** shall be submitted through their respective Points-Of-Contact in accordance with paragraph 7.1 above.

7.4    <u>Communications with Customer.</u> **TNS** will not communicate directly with the Customer regarding the Services or any other matters that fall within the scope of an applicable Amendment and/or Attachments to this MSA without **NSN**'s prior consent, which consent will not be unreasonably withheld. If such consent is given, the communication shall be limited to such matters as have explicitly been provided for in the consent. **NSN** acknowledges and agrees that **TNS**, and



Nokia Siemens
Networks

Contract Number C-1111-0500

companies affiliated with **TNS**, have other direct relationships with **NSN** Customers and potential customers, and that communication with such Customers and potential customers through those relationships will not violate this **TNS** obligation.

7.5 <u>Non-compete.</u>

**TNS** shall, with all due and proper diligence (acting dutifully and in good faith), observe all reasonable instructions given by **NSN** as to its activities under this MSA, act in **NSN**'s interests and use its commercially reasonable efforts to promote, market and increase the sale of **NSN**'s products and services. In particular, **TNS** and its Affiliates shall not enter into a direct contractual relationship with the Customer in competition with **NSN**, with respect to the Works defined/identified in the attached Attachment for a period of 1 year from the expiration or termination of this MSA, unless otherwise agreed in writing. Further, during the term of the MSA **TNS** and its Affiliates shall not market services in competition with **NSN** or otherwise act in a way that may erode **NSN**'s commercial interests with the Customer. However, **TNS** may perform work for the Customer that is different from the Works defined/identified in the Amendments and/or Attachments, and works provided by **NSN** under the Customer Contract, and **NSN** shall not unreasonably withhold its consent to dealings between **TNS** and the Customer.

If **TNS** or an Affiliate of **TNS** enters into a new direct contractual relationship with or engages in marketing towards the Customer in breach of this MSA, **NSN** may terminate this MSA with immediate effect upon providing written notice to **TNS**. In the event that such new direct contractual relationship occurs between **TNS** and the Customer without prior agreement between **TNS** and **NSN**, **TNS** agrees to pay **NSN** as liquidated damages the sum of **ten thousand dollars ($10,000) per occurrence** being the object of such contract between **TNS** (or its Affiliate)and the Customer. The Parties mutually acknowledge that the aforesaid amounts are reasonable in light of the anticipated actual harm that might be caused by any such breach of contract and the difficulty of ascertaining adequate damages.

7.6 <u>Notice of Delays.</u> Should **TNS** not be able to perform its respective obligations within the applicable Time for Completion, then **TNS** shall notify **NSN** immediately thereof and shall immediately provide a plan for remedy of said non-conformity in order to avoid any delays. In the absence of instructions from **NSN** to the contrary **TNS** shall promptly proceed with the remedial actions in accordance with the proposed plan.

**ARTICLE 8 - LOGISTICS**

8.1 In addition to the provisions below, **TNS** shall carry out the tasks relating to logistics as described in an Appendix, Amendments and/or Attachments.

8.2 **TNS** shall make its own arrangements with regard to the loading, unloading, transportation to Sites and the temporary warehousing of the Products, Materials, Equipment, and tools to be supplied by **TNS** and/or **NSN**. It is expressly stated that all the costs for these activities are deemed to be included in the price of the Works unless agreed otherwise by **TNS** and **NSN in writing.**

8.3 **TNS** shall have a process in place to control and document material and equipment inspection receipt for compliance with technical requirement, inclusive of a process to control and dispose of damaged or non-conforming items. For **NSN** and/or Customer provided materials and/or equipment, any discrepancies shall be submitted to **NSN** in conformance with the requirements of the local market. **TNS** shall be responsible for the receipt, handling, and storage of



material/equipment and shall inspect, count, and sign the delivery carrier packing slip and truck bill of lading. Any material discrepancies discovered by **TNS** at time of receipt, shall be immediately reported to **NSN**.

8.4   **TNS** shall have a process in place that will ensure that all materials and equipment under its jurisdiction/control are maintained in accordance with the manufacturer's recommendation or specified requirements and to prevent damage or deterioration of the items.

8.5   **NSN**/Customer material/equipment removed from the Sites shall be returned to the Customer's/**NSN**'s facility or warehouse, as directed by **NSN**.

8.6   **TNS** shall manage and track materials, supplied by **NSN** and/or Customer, and delivered to **TNS's** facilities.

8.7   **TNS** shall continuously maintain adequate protection and security for all of the Works, materials, and/or equipment from damage of theft and shall protect **NSN**'s property, Customer's property and all adjacent property from injury or loss arising in connection with activities under this MSA.

## ARTICLE 9 – TRAINING, LICENSING AND SERVICE EXCELLENCE PROGRAM

9.1   Training - If applicable, **NSN** shall provide training to **TNS**'s key personnel prior to the commencement of the Work. **TNS** will be responsible for and shall pay all costs and expenses incurred by **TNS** in connection with such training, including travel and living expenses as well as the current fees charged by **NSN** for such training of **TNS** personnel. Such key personnel shall train all personnel of the Subcontractor who will perform the Services so as to enable Subcontractor to successfully fulfill its obligations under this MSA and in connection with all applicable Appendices, Amendments, and/or Attachments.

9.2   Service Excellence Program - **TNS** shall comply with all the requirements of **NSN**'s Service Excellence Program (hereinafter referred to as 'SEP") and as more fully described in Appendix 3, "*Service Excellence Program*," throughout the performance of the Services and duration of the MSA. Participation in and compliance with the SEP requirements are mandatory for all suppliers performing services in **NSN** projects.

The SEP encompass **TNS**'s technician registration, training, licensing, quality compliance, reporting and quality uplift trainings. Details pertaining to the SEP shall be contained in a separate document made available to **TNS** and may be updated from time to time as deemed appropriate by **NSN**. **TNS** shall ensure that all its technicians performing work in **NSN** projects have been appropriately registered in the SEP database, qualified, trained, and licensed to perform the services for which **TNS** is contracted. **TNS** shall not permit any of its technicians who have not been appropriately licensed by **NSN** prior to perform any work on **NSN** projects and shall be responsible for all costs incurred by **NSN** as a result of its failure to comply with this requirement. **TNS** shall ensure that its technicians who have been identified as failing to meet the specified quality installation standards attend quality uplift trainings offered from time to time or participate in competence improvement plans as deemed appropriate by **NSN**.

**TNS** shall ensure that its technicians, unless specifically excluded by **NSN**, are registered in the SEP database, qualified, trained, and licensed to perform the Work under this MSA. **TNS** specifically acknowledges that its technicians/employees are prohibited from performing any work under this MSA unless licensed under SEP. All costs associated which SEP compliance shall be the responsibility of **TNS**.



**Nokia Siemens Networks**

Contract Number C-1111-0500

## ARTICLE 10 - QUALITY ASSURANCE

10.1.  Materials. **TNS** is responsible for the quality of all Materials and tools provided or used by **TNS** in the performance of the Services. **TNS's** quality management process shall include the functions required to ensure that the Services satisfy the overall need for quality in the System. **TNS** will provide its quality process to **NSN** and will adjust it, if necessary, to comply with **NSN's** overall quality process. **TNS's** obligations with regard to quality are further described in the applicable Appendix, Amendment and/or Attachment.

10.2.  Quality Management System. A quality management system shall cover subcontractors of **TNS**, and **TNS** shall be responsible for compliance of it's subcontractors as provided for herein.

10.3.  Right of Inspection. **NSN** and/or Customer or their respective representatives shall have the right at all times to inspect the performance of the Services at the Sites and to reject any part thereof that does not comply with the terms of this MSA, including all requirements related to quality. For purposes of any quality inspection, **TNS** shall make all relevant documents and adequate personnel and facilities available to **NSN** or its designee. In case of rejection, **TNS** shall immediately rectify such part thereof that is non-compliant. **NSN** and **TNS** will record the results of such visits to continuously improve the quality of the Services. **NSN** will provide the results of such performance evaluations to **TNS** upon **TNS's** request. Any inspection, checking, approval, or acceptance given on behalf of **NSN** and/or Customer shall not relieve **TNS** from any obligation under this MSA or applicable Amendment and/or Attachment.

10.4.  Quality Audits. **TNS** shall disclose the name and contact details of its material suppliers, subcontractors, and partners that are engaged to support **TNS's** Services under an Appendix, Amendment and/or Attachment to **NSN**. In addition to compliance with the terms and conditions of this MSA, agreements with such suppliers, subcontractors or partners must, contain a requirement which enables **NSN** or Customer to carry out quality audits on the premises of such supplier, subcontractor, or partner and anywhere they might be performing Services. Personnel and facilities of **TNS** and any of its subcontractors shall be made available as required by **NSN** or Customer for purposes of the audit.

10.5.  Self-Audits.  Quality is of major importance in the delivery of the System, and **TNS** is responsible for the quality of the Works it carries out pursuant to Purchase Orders. **TNS** is responsible for 100% self auditing of all sites and 100% compliance with **NSN's** standards. Costs associated with remedial work shall be borne by **TNS**, as shall **NSN's** costs in identifying defective works.  Sites found non-conforming, with service affecting defects, may be subject to re-audit by **NSN**, and in such an event, **TNS** may be assessed $375 per re-audit.

10.6.  Testing. Quality checks and tests of installed facilities shall be performed by **TNS** in accordance with documented requirements of **NSN**.

10.7.  Confidential Documents. **TNS** shall nominate a person that will be responsible for receiving controlled copies of **NSN** Information. These controlled copies are subject to **NSN's** document control service and are constantly updated so that **TNS** always has information which is identical to that which is available to **NSN**. **NSN** is the owner of all **NSN** Information including such documentation, and the documentation must be handled in accordance with the requirements of Article 24, entitled "*Confidential Information.*" **TNS** must introduce and maintain an effective method of managing these documents and the contents of these documents so that the applicable versions of the relevant document are available wherever they are required, and that outdated



documents are immediately removed from wherever they are used.

10.8.   Quality Representative. **TNS** shall nominate a quality representative responsible for constant quality assurance in connection with the Services, this MSA, and any applicable Appendix, Amendment and/or Attachment.

## ARTICLE 11- PRICE AND PAYMENTS

11.1.   Prices. The prices and payment terms for the Services/Work are set forth in this Article 11 and the relevant Appendices, Amendments and/or Attachments. The Parties shall meet, if so requested by **NSN**, to review the prices taking into account then current market conditions and the experience gained from the performance of Services. The prices include all costs and expenses incurred in the provision of the Services (e.g., all personnel costs, whether direct or indirect, overheads, profit, supervision, social costs, hand tools, personal transport, communication costs, office costs, minor installation materials, fixings, duties, freight, insurance, packing, transport, storage, unpacking and removal of waste, positioning, Installation, Commissioning and testing, etc.) as well as all other charges, expenses and taxes arising in the Territory or elsewhere with the sole exception of taxes based on the income of **NSN**. Any additional costs and expenses shall be outlined in the applicable Appendix, Amendment and/or Attachment.

11.2.   Competitive Pricing. **TNS** warrants that the prices given to **NSN** shall not exceed the prices charged to other similarly situated customers of **TNS** for the performance of the Services. It is recognized by **TNS** that the ordering of the Services from **TNS** is always subject to the same being competitive terms of pricing, timing, quality, and other aspects of performance. Upon request by **NSN**, an officer of **TNS** shall certify that **TNS** has complied with the provisions of this paragraph 11.2 at a frequency of not more than once per calendar year. Where it is established that **TNS** has not complied with this paragraph 11.2, then **TNS** shall make a price adjustment to remedy any such discrepancies, which shall take into account the duration over which **TNS** failed to comply with this paragraph 11.2.

11.3.   Payment Terms. The currency of this MSA is United States Dollars. The payment terms and invoicing milestones for the Services are set forth in the applicable Amendment and/or Attachment. Unless otherwise agreed, **NSN**, and subject to the provisions of paragraphs 11.4 through 11.11 shall have no obligation to pay **TNS** any amounts invoiced more than six (6) months following the event or milestone giving rise to **TNS**'s right to invoice **NSN** for such amounts, and **TNS** waives any rights it may have to invoice for and collect such amounts.

11.4    Payment to Subcontractors

   **TNS** shall pay all claims of persons or firms furnishing labor, equipment, or materials used in performing the Work under this MSA in accordance with the terms of applicable agreements between **TNS** and such persons or firms. As a condition precedent to any payment by **NSN**, **NSN** may require **TNS** to submit satisfactory evidence of payment. If there is any evidence of any such unpaid claim, **NSN** may withhold any payment until **TNS** has furnished evidence of payment.

11.5    Extra Site Visits

   In the event **NSN** issues a Notice to Proceed, or such other document advising **TNS** to commence the Works and the Site is not ready for such Works, or **NSN** directs **TNS** to return to the Site, through no fault of **TNS**, the cost for an Extra Site Visit shall be the responsibility of **NSN**. In the event **TNS** is required to return to the Site, for a reason substantially attributable to **TNS**, the cost


Nokia Siemens
Networks

of such Extra Site Visit shall be the responsibility of **TNS**. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the Extra Site Visit within seven (7) calendars days of its occurrence, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Extra Site Visit.

11.6   Pass Through Costs

Pass-Through Costs are those cost incurred by **TNS** for Works/Services, or otherwise, as requested and approved by **NSN** but which are not priced elsewhere within this MSA and which costs are reimbursable to **NSN** by the Customer (as such costs are identified in the applicable Supplement to this MSA). Notwithstanding any provision to the contrary, **TNS** must submit a Change Order for all pass-through reimbursable costs and third party invoices to **NSN** within thirty (30) calendar days following completion of the Works. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the Pass-Through Costs within said thirty (30) calendar days of incurring the costs, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Pass-Through Costs.

11.7   Change Orders

**TNS** shall not commence extra works under Article 4, "*Changes*" without the prior issuance of a Purchase Order provided that **NSN** may, at its discretion, direct **TNS**, by e-mail, to perform such extra works and provided that **TNS** shall submit a Change Order Request within thirty (30) calendar days of completion of such extra works. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a Change Order within said thirty (30) calendar days of performing the Works, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Change Order.

11.8   Extra Works

In the event **TNS** believes it has performed extra works and/or provided extra materials and/or equipment outside the Scope of Work, **TNS** shall submit a claim within thirty (30) Days of performing such extra works and/or providing extra materials and/or equipment. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the extra works and/or providing extra materials and/or equipment said thirty (30) Days of performing the Works/providing the materials/equipment, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the extra works/materials and/or equipment.

11.9   Adjustments

All prices are fixed for the duration of the identifiable project and are not subject to escalation for any cause during that period.   Payment of the Unit Rates/Hourly Rates shall constitute full payment for performance of the Work and covers all costs of whatever nature incurred by **TNS** in accomplishing the Work in accordance this MSA, attached Appendices, Amendments and/or Attachments.

11.10   Acceptance

No payment of invoices or portions thereof shall at any time constitute approval or acceptance of any Works under this MSA, Appendices, Amendments and/or Attachments, nor be considered a waiver by **NSN** or Customer of any of the terms of this MSA.  However, title to all equipment and materials for which payment has been made, whether or not the same has been incorporated in



the Work, and title to all completed Works whether paid for or not, shall vest in **NSN**, or Customer as the case may be, and in any case shall not be part of **TNS**'s property or estate in the event **TNS** is adjudged bankrupt or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of **TNS**'s insolvency, or if this MSA, Amendment and/or Attachment is terminated.

11.11  Supporting Documentation

The submission of any claim for an Extra Site Visit, Pass-Through Costs, Change Orders, Extra Works, or any other claim for payment by **TNS**, shall be supported by all documentation/data as may be reasonably requested by **NSN**.

## ARTICLE 12 - AUDIT RIGHTS

12.1  During the term of this MSA and for three (3) years thereafter, employees of **NSN**, at its cost, and its public auditors may audit the accuracy of **TNS**'s charges to **NSN** and verify that the Services have been or are being performed in accordance with this MSA and applicable Appendices, Amendments and/or Attachments.

12.2  **NSN** designated personnel will be provided with reasonable access to books and records and facilities which are related to this MSA and **TNS**'s activities and billings hereunder. Such audits may be conducted at any time during normal business hours upon reasonable prior notice by **NSN** to **TNS**. **TNS** will cooperate in the audit, will make the information reasonably required to conduct the audit available on a timely basis and will provide reasonable assistance to the representatives of **NSN** conducting the audit.

12.3  With respect to the amounts chargeable to and payments made by **NSN** under this MSA, **TNS**'s records shall be kept in accordance with generally accepted accounting principles applied on a consistent basis.

12.4  Following each audit, **NSN** will notify **TNS** of any issues identified in the audit that pertain to **TNS** and its performance under this MSA. Within ten (10) Working Days following such notice from **NSN**, **TNS** will submit to **NSN** a corrective action plan for any deficiencies in **TNS**'s performance of the Services identified in the audit, and will correct any identified deficiencies at no cost to **NSN**. **TNS** will remit to **NSN** any undisputed overcharges paid by **NSN** to **TNS** that are identified in the audit within thirty (30) Days following **NSN**'s notification of such overcharges. If the overcharges are more than five percent (5%) of the amount that should have been paid by **NSN**, **TNS** shall also remit to **NSN** interest on such overcharges equal to the lesser of (i) two percent per annum more than the prime rate established from time to time by Citibank N.A., New York on the date on which **NSN** notified **TNS** of the overcharge, or (ii) the maximum rate of interest allowed by applicable law. Such interest will be applied during the period of time between when **NSN** made the overcharge payment to **TNS** and **TNS** subsequently remitted the overcharge to **NSN**.

## ARTICLE 13 - MECHANIC'S LIENS

13.1.  No Lien Rights. In addition to the **TNS**'s obligations set forth under paragraphs 13.2 and 13.3, as a material inducement to **NSN** for entering into this MSA, subject to **NSN's** payment to **TNS** of all undisputed amounts due and payable to **TNS** under this MSA, **TNS** agrees and acknowledges that it will file no lien (and, to the fullest extent permitted by applicable law, waives all rights to file a lien) against any of the Services, Material, Equipment and/or Sites which are the subject of this



MSA or any Amendment and/or Attachment. **TNS** hereby waives and releases all lien rights, whether statutory or constitutional, equitable, contractual or otherwise available under common law or equity. **TNS** also agrees to obtain an agreement and lien rights waiver from each subcontractor and/or supplier with whom it does business in connection with this MSA on terms no less strict than those contained herein. **TNS** agrees and understands that such a waiver is of great importance to **NSN**, that the ownership interests and rights associated with the Services, Material, Equipment and Sites are complex, and that lien claims filed against same are likely to cause serious damage to **NSN**, **NSN**'s Customers and third parties. **TNS** further agrees that its sole recourse for payment under this MSA and in connection with any Amendment and/or Attachment will be against **NSN** only. **TNS** agrees to sign any additional documents that **NSN** may reasonably request to verify or perfect the agreements in this Article 13, this MSA and any Appendices, Amendments and/or Attachments; provided that such documents are on terms mutually acceptable to the Parties and do not alter the rights or obligations of the Parties under this MSA.

13.2   Removal of Liens/Final Waiver of Lien/Payment to Subcontractors. **TNS** will pay its subcontractors for all services, materials, equipment and labor used under this MSA in accordance with the terms of the applicable agreements with such subcontractors and will keep **NSN**'s and Customer's real or leasehold property and all Sites free of claims or liens. **TNS** will submit to **NSN** a signed and notarized Waiver and Release of Liens substantially in the form attached as Appendix 4, "*Final Waiver of Lien*", and Appendix 5, "*Release and Certificate of Payment*" modified to comply with applicable state law, executed by **TNS** and all its subcontractors of all tiers at such intervals as **NSN** may, at its discretion, determine. **TNS** agrees to indemnify and defend **NSN** from and against any lien claims and to discharge any lien or furnish an indemnity bond equal to the amount required by law within  fifteen (15) days of notice from **NSN** of the presence of any lien. **NSN** will be entitled to pay any lien claim not discharged as required by this Article 13 and to charge the amount so paid against amounts due **TNS**.

**NSN** reserves the right to make direct payment to **TNS**'s subcontractors and deduct the payment from amounts due to **TNS** or to make payments jointly to **TNS** and its subcontractors as **NSN** determines necessary to protect **NSN**'s rights under this MSA or to protect any Site from liens. Nothing in this Article 13 will create any obligation on the part of **NSN** to make any payment to any of **TNS** subcontractor and no payment by **NSN** to any of **TNS** subcontractors will create any obligation to make any further payment to this subcontractor.

13.3   Sworn Statement. THE LAW IN SOME JURISDICTIONS REQUIRES THAT **TNS** SHALL SUBMIT A SWORN STATEMENT OF PERSONS FURNISHING MATERIALS AND LABOR BEFORE ANY PAYMENTS ARE REQUIRED TO BE MADE TO **TNS**. Upon the request of **NSN**, **TNS** shall provide **NSN** with a sworn statement, substantially in form attached as Appendix 6, "*Contractor's Affidavit,*" of the names and addresses of all Parties' furnishing materials and/or labor and the amounts due or to become due to each.

## ARTICLE 14 – WARRANTIES

14.1   Generally. **TNS** warrants that:

  (a)   it has the personnel and other resources with the necessary skills and experience to fulfill **TNS**'s obligations under this MSA;

  (b)   all personnel of **TNS** and of **TNS**'s subcontractors involved in the performance of the Services have all necessary professional qualifications and shall at all times behave in a professional manner whether at Site or when in contact with the Customer or otherwise;


Nokia Siemens
Networks

Contract Number C-1111-0500

(c)    the Services shall be performed with due care and skill and in accordance with the relevant laws, regulations, national standards, Orders, this MSA, the applicable Amendment and/or Attachment, and **NSN**'s instructions, procedures, processes and documentation that have been communicated to **TNS** in writing, and that after the Services have been performed, the Equipment will be free of any defects in engineering and workmanship arising in connection with the Services; and

(d)    all Materials supplied in connection with the Services shall be (i) of good and merchantable quality; (ii) fit for the System; (iii) new and not previously used; and (iv) free from defects in engineering, workmanship and Installation.

14.2   Warranty Period. The warranty period is twelve months from the date of **NSN** Acceptance, or in respect of replaced or repaired parts, twelve (12) months from such repair or replacement, which period, however, shall not expire prior to the expiry of the original warranty period. If **NSN** notifies **TNS** in writing during the warranty period of any failure of the Services to comply with any of the warranties under paragraph 14.1, then **TNS** shall at its own cost promptly and in any event within five (5) Working Days of such notification commence correction of all such failures in the Services or repair/replace the defective Materials unless such failure is service affecting and in such an event, such repair/replace shall be implemented with twenty-four (24) hours of notice. If **TNS** does not comply with its obligations regarding such failures within the foregoing periods, then **NSN** may, at its option and in addition to any other rights or remedies it may have, take action to have the failures corrected by a third party at **TNS**'s expense. **TNS** agrees that failures repaired by third parties, and Services performed by third parties at Sites or in a Zone where **TNS** has performed or will perform Services, shall not void any **TNS** warranties unless TNS can demonstrate negligence or intentionally wrongful misconduct by said third parties should result in the voiding of a specific and relevant warranty.

14.3   Title. Upon delivery of invoice, **TNS** represents and warrants (i) **NSN** shall have title to drawings, designs, equipment, materials, and any other items delivered pursuant to such Purchase Order free and clear of any and all liens and encumbrances of any kind and (ii) **TNS** has all requisite authority and has obtained all authorizations required by law or under any agreement from any and all third parties necessary for **TNS** to grant **NSN** the rights and interests in the Deliverables.

14.4   Subcontractors' and Manufacturers' Warranties. **TNS** shall assign all subcontractors', manufacturers' or other warranties on any and all materials, equipment and services delivered to **NSN** and/or Customer by **TNS** (if any) to the extent assignable to **NSN** and/or Customer on demand and in no event later than delivery of the material, equipment or service. **TNS** shall use commercially reasonable efforts to make all such warranties assignable to **NSN**.

14.5   **NSN** shall provide **TNS** with written notice of any alleged or claimed breach of the foregoing warranty ("Notice of Breach") within one hundred eighty (180) Days after discovery thereof.

## ARTICLE 15 - PERFORMANCE BOND, PARENT COMPANY GUARANTEE AND BANK GUARANTEE

15.1   Performance Bond - If required by **NSN** under a Purchase Order, **TNS** shall submit to **NSN** irrevocable, unconditional, on-demand performance and payment bonds within fourteen (14) Days prior to commencement of the Work. The performance and payment bonds shall be equal to ten percent (10%) of the estimated value of the Work set forth in such Purchase Order provided that the estimated value, increase or decrease, shall be reviewed not less than annually, and issued in a form and by a first class bank acceptable to **NSN** as security against any default under this MSA



Contract Number C-1111-0500

by **TNS**. The payment and performance bonds shall remain valid until earlier of (i) the date the Purchase Order is terminated or expires or (ii) the date of Acceptance; and (iii) NSN receipt of applicable Final Waiver of Lien(s) and NSN receipt of applicable Release and Certificate(s) of Payment. In the event **TNS** fails to complete any Work in accordance with the applicable Purchase Order or applicable Scope of Work, **NSN** shall be entitled to recover, under the bonds, all costs incurred in retaining an alternative contractor to complete such Work Task as quickly as possible, up to the full amount of the bond. **NSN** shall be entitled to recover actual damages incurred from such delay in excess of the amount of the bonds, if any, directly from **TNS**.

15.2    Parent Company Guarantee - If required by **NSN** under a Purchase Order, **TNS** shall provide a Parent Company Guarantee to **NSN**. The Parent Company Guarantee shall be in a form mutually acceptable to the Parties and shall remain valid until any and all obligations of **TNS** remain unsettled under the Purchase Order.  The aggregate liability of TNS's guarantor shall not exceed the total of purchased services under such Purchase Order.

15.3    Bank Guarantee – If required by NSN under a Purchase Order, TNS shall provide an unconditional and irrevocable bank guarantee, in a form and drawn on a bank reasonably acceptable to NSN, in an amount not to exceed ten percent (10%) of the estimated value of the Purchase Order and for the purpose of the Purchase Order, the agreed upon value equal to the total of purchased services under such Purchase Order.

## ARTICLE 16 – INDEMNITIES

16.1    By **NSN**. **NSN** will indemnify **TNS**, its officers, directors, employees, agents, successors and assigns (each, a "TNS Indemnified Party"), from, and defend such parties against, any liability (including judgments and settlements) or expenses (including reasonable attorneys' fees and expenses, court costs and other litigation expenses) to the extent arising out of or relating to any claim brought by a third party against such parties,:

   (a)    that the **NSN** Information (other than **NSN** Information developed by or under Specifications or other specific instructions of Customer or **TNS**) infringes or contributory infringes upon the proprietary rights of any third party, except to the extent that such infringement is caused by (i) **TNS**'s failure to use such **NSN** Information in accordance with the terms of this MSA and any related documentation provided to **TNS** or modification thereof not made by or pursuant to Specifications or other specific instructions furnished by **NSN**, (ii) **TNS**'s failure to use corrections or modifications thereof provided by **NSN**, (iii) **TNS**'s use thereof in combination with a product or information not furnished by or obtained at the specific instruction of **NSN**, or (iv) information, directions, Specifications or Materials provided by **TNS**;

   (b)    relating to the inaccuracy or untruthfulness of any representation or warranty of **NSN** contained in this MSA;

   (c)    relating to **NSN**'s breach of any of its obligations under this MSA; and

   (d)    relating to personal injury (including death) or damage to property resulting from **NSN**'s acts or omissions.

16.2    By **TNS**. **TNS** will indemnify **NSN** and Customer and their officers, directors, employees, agents, successors and assigns (each, an "NSN Indemnified Party"), from, and defend such parties against, any liability (including judgments and settlements) or expenses (including reasonable





Nokia Siemens
Networks

Contract Number C-1111-0500

attorney's fees and expenses, court costs and other litigation expenses) to the extent arising out of or relating to any claim brought by a third party against such parties,

(a)     that the Services, Materials, Work Product, Pre-existing Materials, any enhancements or modifications to the **NSN** Information performed by or under the specifications or other specific instructions **TNS**, or any other resources or items provided to **NSN** by **TNS** infringe or contributory infringe upon the proprietary rights of any third party, except to the extent that such infringement is caused by (i) **NSN**'s failure to use such item in accordance with the terms of this MSA and any related documentation provided to **NSN** or modifications thereof not made by or pursuant to specifications or other specific instructions furnished by **TNS**, (ii) **NSN**'s failure to use corrections or modifications thereof provided by **TNS**, (iii) **NSN**'s use thereof in combination with a product or information not furnished by or obtained at the specific instruction of **TNS**, or (iv) information, directions, specifications or materials provided by **NSN**;

(b)     relating to any duties or obligations of **TNS** under an agreement between **TNS** and any third party;

(c)     relating to the inaccuracy or untruthfulness of any representation or warranty of **TNS** contained in this MSA;

(d)     relating to **TNS**'s breach of any of its obligations under this MSA;

(e)     relating to personal injury (including death) or damage to property resulting from **TNS**'s acts or omissions or the acts or omissions of **TNS**'s employees or subcontractors; and

(f)     relating to all claims to the extent resulting from any acts or omissions of **TNS** that are brought under common law or statute, including, but not limited to, strict tort liability, strict products liability, negligence, misrepresentation, or breach of warranty, except to the extent that **NSN** is primarily responsible.

16.3   Indemnification Procedures. To be indemnified under this Article 16, the Party claiming indemnification must notify the other Party in writing of any claim or suit for which indemnification is sought as soon as reasonably possible and in no event more than sixty (60) days of the claim, provide reasonable cooperation (at the non-indemnifying Party's expense) and tender full authority to defend or settle the claim or suit.

16.4   Settlement. Neither Party has any obligation of indemnity in connection with any settlement made without its written consent. The indemnified Party has the right to participate, at its own expense, in the claim or suit and in selecting counsel.

## ARTICLE 17 - DAMAGES

17.1   Consequential Damages. NEITHER PARTY WILL BE LIABLE FOR, NOR WILL THE MEASURE OF DAMAGES INCLUDE, ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR AMOUNTS FOR LOSS OF INCOME, PROFITS OR SAVINGS ARISING OUT OF OR RELATING TO ANY CLAIM OR OTHER MATTER (WHETHER IN CONTRACT, TORT OR OTHERWISE) INCLUDING, WITHOUT LIMITATION, THEIR PERFORMANCE OR FAILURE TO PERFORM UNDER THIS MSA OR ANY AMENDMENT AND/OR ATTACHMENT.





Nokia Siemens
Networks

Contract Number C-1111-0500

17.2   Exclusions. The limitations of liability set forth in paragraph 17.1 shall not apply to (i) indemnification claims set forth in Article 16, (ii) the amounts included within the liquidated damages set forth in Section 20.1, or (iii) damages suffered or losses incurred by **NSN** or **TNS** in connection with the gross negligence or willful misconduct of the other Party.

## ARTICLE 18 - INSURANCE

18.1   Insurance Requirements. **TNS** shall comply with the **NSN** Minimum Insurance Requirements stated in Appendix 7, "*Insurance Requirements,*" and, in addition, **TNS** shall provide any supplemental/additional Insurance mandated by the Customer. **TNS** shall provide **NSN** with a Certificate of Insurance upon contract signature or not later than the date for commencement of the Works and which Certificate of Insurance shall identify **NSN** as "*additional insured.*"

## ARTICLE 19 - DOCUMENTATION

19.1   Documentation. **TNS** shall at its expense immediately correct all discrepancies, errors, or omissions in drawings and other documentation provided by **TNS** to **NSN** hereunder. Such correction shall be without prejudice to any other rights **NSN** may have as a consequence of such discrepancies, errors, and omissions by law or under this MSA.

19.2   **NSN** Information. All **NSN** Information delivered hereunder shall be checked by **TNS** and any errors shall be notified to **NSN** immediately.

19.3   Updating of Tools. The **TNS** shall appoint a person for each Zone, and identify that person to **NSN**, who will be responsible for updating **NSN** database tools per the requirements of the Amendments and/or Attachments.

## ARTICLE 20 – DELAYS

20.1   **TNS** Delay. If Acceptance or completion of the Work/Services is delayed beyond the Time for Completion set forth in the applicable Purchase Order or in this MSA for reasons primarily attributable to **TNS**, then **TNS** shall pay liquidated damages to **NSN** calculated on the basis of the price of the delayed Services at the rate of two percent (2%) per week of delay (and pro-rata for any part thereof), up to a maximum of twenty percent (20%) of the price of the delayed Services. Delayed Services shall include any Services that are completed but cannot be brought into use because of a delay in other Services.

20.2.   Right to Cancel. If the delay attributable to **TNS** continues for a period exceeding fifteen (15) Days, in addition to any other rights **NSN** may have, **NSN** shall be entitled to terminate the relevant Order, Amendment and/or Attachment for material breach.

20.3   **NSN** Delay. **TNS** shall not be liable for delays that are_ primarily attributable to **NSN** or a third party. When **TNS** encounters a delay which in its reasonable opinion is attributable to **NSN** or a third party, it shall inform **NSN** accordingly within two (2) Working Days and shall also advise **NSN** within the same time period of a reasonable approximation of the effect of such delay on the time schedule and the Time for Completion of the Services. **TNS** shall use its commercially reasonable efforts to recover from any such delays.

## ARTICLE 21 - TERM AND TERMINATION

21.1.   Initial Term. This MSA becomes effective on the Effective Date, and shall, unless earlier


Nokia Siemens
Networks

Contract Number C-1111-0500

terminated in accordance with this MSA, shall remain valid for a term three (3) years, and thereafter until all related obligations hereunder have been duly performed. After the Initial Term, **NSN** shall have the option to renew this MSA on the terms set forth herein for subsequent one (1) year terms b y giving **TNS** notice of its intention to renew not less than thirty (30) calendar days prior notice to the expiration of the then current term. In the event of expiration or termination of this MSA, the terms of this MSA shall nonetheless survive and continue in effect with respect to any Orders which have not also expired or been terminated.

21.2.   Termination for Breach. If either Party is in default of a material obligation under this MSA and fails to remedy such default within thirty (30) Days from the date of the other Party's written notice drawing the attention of such Party to the default and requiring the same to be remedied, then the non-defaulting Party shall have the right to terminate this MSA. In the event of bankruptcy, receivership or comparable procedure of a Party, then the non-defaulting Party may terminate this MSA forthwith.

21.3.   Cancellation or Termination of Customer Contract. In the event that a Customer Contract is cancelled or terminated for any reason, then **NSN** may immediately terminate the relevant Appendix, Amendment and/or Attachment and any or all Orders issued forthwith. **TNS** shall be compensated if **NSN** is compensated by Customer for any such cancellation or termination proportionally.

21.4.   Termination for Convenience. **NSN** shall have the right to terminate any or all Orders, this MSA, and any Appendix, Amendment and/or Attachment, in whole or in part, for its convenience upon thirty (30) Days prior written notice to **TNS**. In such event, **TNS** shall promptly, and in no event later than the date of expiry of said notice period, cease all relevant Services. **TNS** shall be paid in full for (a) all Services duly completed and Accepted by **NSN** under this MSA and the applicable Appendices, Amendments and/or Attachments, (b) all Services that may be in process at the time of termination based on the percentage the applicable milestone, deliverable or task has been completed, as negotiated and agreed by the Parties in good faith, and (c) all additional direct and documented costs and expenses incurred by **TNS** and which **TNS** cannot mitigate, as a result of the early termination of such services (e.g., termination of leases, equipment rentals, etc.). In addition, **TNS** shall be paid for additional Services specified by **NSN** in writing and shall receive payment for such Services in proportion to the amount of Services rendered. In all cases where a claim for compensation is made by **TNS** hereunder, such claim must be submitted to **NSN** with supporting documentation within forty-five (45) Days of receipt of notice of termination or later for particular Services if agreed in writing by the Parties. In no event shall such compensation exceed the payments that would have been made to **TNS** under the relevant terminated Orders. **NSN** shall not be obligated to pay the compensation to **TNS** set forth in item (c) above in the event that termination has been due to material breach by **TNS** under paragraph 21.2 above of an Order, this MSA, Appendix, Amendment and/or Attachment.

21.5   Procedure Upon Termination.

Upon receipt of a notice of termination of all or any portion of the Work under some or all Purchase Orders, under paragraph 21.2, or termination of the entire MSA and all Work under all Purchase Orders under paragraph 21.3, **TNS** shall do the following (to apply only to the portion of the Work terminated and not the entire MSA if a portion has been terminated under paragraph 21.2):

(a)   Stop Work under this MSA on the date such notice of termination is received and to the extent specified in the notice of termination, except those services that are reasonably



Nokia Siemens
Networks

Contract Number C-1111-0500

necessary to be provided in connection with a termination of this MSA;

(b)   Place no further orders or subcontracts for materials, services, or facilities to the extent they relate to the performance of the Work terminated;

(c)   Terminate subcontracts to the extent they relate to the performance of the Work terminated;

(d)   Settle all outstanding liabilities and all claims arising out of any termination of subcontracts for materials, equipment, or services in accordance with the applicable terms of such subcontracts;

(e)   Take such action as may be reasonably necessary, or as **NSN** may direct, for the protection and preservation of the property related to this MSA that is in the possession of **TNS** or any **TNS** subcontractor and in which **NSN** has or may acquire an interest;

(f)   Submit a written final status report detailing the progress made toward completion of the Purchase Order, and any items of the Purchase Order not yet performed; and

(g)   Complete all wind-down activities at **TNS**'s headquarters within sixty (60) Days after the effective date of termination.

21.6   In the event of termination (other than by reason of **TNS's** material breach of this MSA), **TNS** shall be entitled to payment for:

(a)   Work-in-progress that has not been completed as of the date specified in the notice of termination, with the payment equal to a percentage of the applicable Work Payment Price(s) that is equal to the percentage of Works, as determined by the Parties, actually completed; and

(b)   any and all reasonable and documented wind-down expenses incurred by **TNS** as a result of early termination. **TNS** shall submit an invoice to **NSN** for amounts due under this Section on a monthly basis, provided **TNS** shall use commercially reasonable efforts to invoice for all amounts due within forty-five (45) calendar days of the effective date of termination.   No invoices shall be submitted later than ninety (90) calendar days after the effective date of termination.

(c)   The amounts payable by **NSN** under paragraph 21(b) shall be verified at **NSN**'s request and expense by a nationally recognized firm of certified public accountants appointed by **NSN** and reasonably acceptable to **TNS**. **TNS** shall be entitled to payment by **NSN** of undisputed amounts in such invoice within sixty (60) Working Days after **NSN**'s receipt of the invoice. Payment of the amount payable by **NSN** to **TNS** pursuant to this paragraph 21.6(c) above shall constitute a total discharge of **NSN**'s liabilities to **TNS** for termination under this Article 21.

21.7   Upon payment in full of all amounts outstanding under this MSA, **NSN** may require **TNS** immediately to transfer to **NSN** in the manner and to the extent directed by **NSN**, title to and possession of any items comprising all or any part of the Work terminated (including all Work-in-progress, deliverables, subcontracts and associated warranties). **TNS** shall, upon direction of **NSN** and at **NSN**'s expense, use commercially reasonable efforts to protect and preserve property in the possession of **TNS** or its subcontractors in which **NSN** has an interest and shall facilitate



Nokia Siemens
Networks

Contract Number C-1111-0500

access to and possession by **NSN** of deliverables comprising all or part of the Work terminated.

21.8  Suspension by Customer. If at any time a competent governmental authority revokes or suspends a Customer's license to construct or operate the System, or if a Customer for any reason instructs **NSN** to stop or suspend work for a period of time, then **NSN** may require that **TNS** stop or suspend the relevant Services. At such time when **NSN** is instructed by the Customer to proceed with the work, **NSN** shall issue a new time schedule for the performance of the Services in question. **NSN** shall also compensate **TNS** as provided under paragraph 21.6 for any direct costs resulting from such rescheduling and that **TNS** cannot otherwise mitigate. In all cases where a claim for compensation is made by **TNS** hereafter, such claim must be submitted to **NSN** with supporting documentation within fourteen (14) Days of issuance of the new time schedule. In no event shall such compensation exceed the payments that would have been made to **TNS** in the absence of such rescheduling.

## ARTICLE 22 - FORCE MAJEURE

22.1  Force Majeure Event. If and to the extent that a Party's performance of any of its obligations pursuant to this MSA is prevented, hindered or delayed directly or indirectly by events beyond such Party's control, including but not limited to fire, flood, earthquake, tornadoes, hurricanes, elements of nature or acts of God, acts of war, terrorism, sabotage, riots, civil disorders, (each, a "Force Majeure Event"), and such nonperformance, hindrance or delay could not have been prevented by the taking of all reasonable precautions by the non-performing, hindered or delayed Party, then the nonperforming, hindered or delayed Party will be excused for such nonperformance, hindrance or delay, as applicable, of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use efforts consistent with industry standards and practices to promptly recommence performance, including through the use of alternate sources, workaround plans or other means. The Party whose performance is prevented, hindered, or delayed by a Force Majeure Event will promptly notify the other Party by telephone (confirmed in writing as soon as possible following the inception of the delay) of the occurrence of the Force Majeure Event, describing in reasonable detail the nature of the Force Majeure Event. It is expressly agreed that strikes and union disputes, are not to be considered an event of Force Majeure.

22.2  No Liability. Neither Party shall be liable to the other for any delay or nonperformance of its obligations hereunder in the event and to the extent that such delay or nonperformance is due to a Force Majeure Event; provided that a Force Majeure Event shall not prevent or delay a Party's obligation to make payments to the other Party that are due and payable hereunder.

22.3  Suspension. The Party whose performance is prevented, hindered or delayed by a Force Majeure Event may suspend such performance under the Order, in whole or in part, for the duration of the Force Majeure Event and resume performance under the Order once the Force Majeure Event ceases, with an option to extend the Time of Completion up to the length of time the contingency is endured.

22.4  Termination. If the performance of any Services becomes substantially suspended as the result of a Force Majeure Event for a continuous period exceeding one (1) month, then either Party shall have the right to cancel the Order under which the delayed Services are being performed or this MSA in respect of the unperformed part thereof. However, **TNS** shall be compensated as provided for in the relevant Order for Services which have been completed up to the date of cancellation.

## ARTICLE 23 - INTELLECTUAL PROPERTY RIGHTS



23.1 **NSN Intellectual Property and NSN Information. TNS** acknowledges and accepts that all **NSN** Intellectual Property and all **NSN** Information that is provided to **TNS** under or in connection with this MSA is and shall remain the exclusive property of **NSN** and its licensors, whether or not specifically recognized or perfected under applicable law. **NSN** (and/or its licensors) will own all rights in any copy, translation, modification, adaptation, or derivation of the **NSN** Intellectual Property or the **NSN** Information, including any improvement or development thereof.

23.2 License. **NSN** hereby grants to **TNS** a personal, non-exclusive, non-transferable, royalty-free license to use the **NSN** Information solely for the performance of the Services. **TNS** will not use or copy the **NSN** Information for any other purpose than for the performance of the Services under this MSA or take any other action that jeopardizes **NSN**'s rights in the **NSN** Intellectual Property or the **NSN** Information.

23.3 Termination of License. **TNS**'s right to use the **NSN** Information will terminate automatically upon the expiry or termination of this MSA. **TNS** shall, upon the expiry or termination of this MSA, (i) make no further use of the **NSN** Information; (ii) promptly return to **NSN** all **NSN** Information and any and all copies thereof; and (iii) submit to **NSN** a properly signed and executed written document stating that all **NSN** Information that is in writing or in any other tangible form that has been disclosed to **TNS** by **NSN**, as well as any and all copies thereof, have been returned to **NSN.**

23.4 Work Product. All Work Product developed as a part of the performance of Work hereunder, wherever located, shall belong exclusively to **NSN** and shall, to the extent possible, be considered a work made for hire for **NSN** within the meaning of Title 17 of the United States Code. **TNS** hereby assigns, and automatically assigns at the time of creation of the Work Product, without any requirement of further consideration, any and all right, title, or interest in such Work Product, including any patents, copyrights or other intellectual property rights pertaining thereto and any and all rights to use, copy, distribute, sublicense, make and have made the Work Product. Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be referred to as "moral rights." Upon request of **NSN**, **TNS**, at **NSN**'s expense, shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment. If any Pre-Existing Materials are embedded in any Work Product, **TNS** hereby grants to **NSN** a perpetual, royalty-free, transferable, nonexclusive license to use such embedded Pre-Existing Materials solely in connection with the use and exploitation of such Work Product and only so long as such Pre-Existing Materials remain embedded in such Work Product and are not separated there from.

## ARTICLE 24 - CONFIDENTIAL INFORMATION

24.1 Defined. "Confidential Information" means:

(a) technical, financial and commercial information and data relating to a Party's or Customer's respective businesses, finances, planning, facilities, products, techniques and processes and shall include, but is not limited to, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, tracings, diagrams, models, samples, flow charts, data, computer programs, disks, diskettes, tapes, marketing plans, customer names, pricing and other technical, financial or commercial information and intellectual properties, whether in written, oral or other tangible or intangible forms;

(b) **NSN** Intellectual Property;

