# EXHIBIT I

Part Two


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

the aforesaid amounts are reasonable in light of the anticipated actual harm that might be caused by any such breach of contract and the difficulty of ascertaining damages.

<div style="border:1px solid">Deleted: Note: to be discussed - TNS would like to understand better what is meant by "Sites" in this context; amount of LD to be discussed as well</div>

7.6    Notice of Delays. Should **TNS** not be able to perform its respective obligations within the applicable Time for Completion, then **TNS** shall notify **NSN** immediately thereof and shall immediately provide a plan for remedy of said non-conformity in order to avoid any delays. In the absence of instructions from **NSN** to the contrary **TNS** shall promptly proceed with the remedial actions in accordance with the proposed plan.

## ARTICLE 8 - LOGISTICS

8.1    In addition to the provisions below, **TNS** shall carry out the tasks relating to logistics as described in an Amendments and/or Attachments.

8.2    **TNS** shall make its own arrangements with regard to the loading, unloading, transportation to Sites and the temporary warehousing of the Products, Materials, Equipment, and tools to be supplied by **TNS** and/or **NSN**. It is expressly stated that all the costs for these activities are deemed to be included in the price of the Works unless agreed otherwise by **TNS** and **NSN**.

<div style="border:1px solid">Formatted: Font color: Blue</div>

8.3    **TNS** shall have a process in place to control and document material and equipment inspection receipt for compliance with technical requirement, inclusive of a process to control and dispose of damaged or non-conforming items. For **NSN** and/or Customer provided materials and/or equipment, any discrepancies shall be submitted to **NSN** in conformance with the requirements of the local market. **TNS** shall be responsible for the receipt, handling, and storage of material/equipment and shall inspect, count, and sign the delivery carrier packing slip and truck bill of lading. Any material discrepancies discovered by **TNS** at time of receipt, shall be immediately reported to **NSN**.

8.4    **TNS** shall have a process in place that will ensure that all materials and equipment under its jurisdiction/control are maintained in accordance with the manufacturer's recommendation or specified requirements and to prevent damage or deterioration of the items.

8.5    **NSN**/Customer material/equipment removed from the Sites shall be returned to the Customer's/**NSN**'s facility or warehouse, as directed by **NSN**.

8.6    **TNS** shall manage and track materials, supplied by **NSN** and/or Customer, and delivered to **TNS**'s facilities.

8.7    **TNS** shall continuously maintain adequate protection and security for all of the Works, materials, and/or equipment from damage of theft and shall protect **NSN**'s property, Customer's property and all adjacent property from injury or loss arising in connection with activities under this MSA.

## ARTICLE 9 – TRAINING, LICENSING AND SERVICE EXCELLENCE PROGRAM

9.1    Training - If applicable, **NSN** shall provide training to **TNS**'s key personnel prior to the commencement of the Work. **TNS** will be responsible for and shall pay all costs and expenses incurred by **TNS** in connection with such training, including travel and living expenses as well as the current fees charged by **NSN** for such training of **TNS** personnel. Such key personnel shall train all personnel of the Subcontractor who will perform the Services so as to enable Subcontractor to successfully fulfill its obligations under this MSA and in connection with all applicable Appendices, Amendments, and/or Attachments.

<div style="border:1px solid">Deleted: NSN</div>



Contract Number XXXXXX-XXXX

9.2    Service Excellence Program - **TNS** shall comply with all the requirements of **NSN**'s Service Excellence Program (hereinafter referred to as 'SEP") and as more fully described in Appendix 3, *"Service Excellence Program,"* throughout the performance of the Services and duration of the MSA. Participation in and compliance with the SEP requirements are mandatory for all suppliers performing services in **NSN** projects.

The SEP encompass **TNS**'s technician registration, training, licensing, quality compliance, reporting and quality uplift trainings. Details pertaining to the SEP shall be contained in a separate document made available to **TNS** and may be updated from time to time as deemed appropriate by **NSN**. **TNS** shall ensure that all its technicians performing work in **NSN** projects have been appropriately registered in the SEP database, qualified, trained, and licensed to perform the services for which **TNS** is contracted. **TNS** shall not permit any of its technicians who have not been appropriately licensed by **NSN** prior to perform any work on **NSN** projects and shall be responsible for all costs incurred by **NSN** as a result of its failure to comply with this requirement. **TNS** shall ensure that its technicians who have been identified as failing to meet the specified quality installation standards attend quality uplift trainings offered from time to time or participate in competence improvement plans as deemed appropriate by **NSN**.

**TNS** shall ensure that its technicians, unless specifically excluded by **NSN**, are registered in the SEP database, qualified, trained, and licensed to perform the Work under this MSA. **TNS** specifically acknowledges that its technicians/employees are prohibited from performing any work under this MSA unless licensed under SEP. All costs associated which SEP compliance shall be the responsibility of **TNS**.

## ARTICLE 10 - QUALITY ASSURANCE

10.1.    Materials. **TNS** is responsible for the quality of all Materials and tools provided or used by **TNS** in the performance of the Services. **TNS**'s quality management process shall include the functions required to ensure that the Services satisfy the overall need for quality in the System. **TNS** will provide its quality process to **NSN** and will adjust it, if necessary, to comply with **NSN**'s overall quality process. **TNS**'s obligations with regard to quality are further described in the applicable Amendment and/or Attachment.

10.2.    Quality Management System. A quality management system shall cover subcontractors of **TNS**, and **TNS** shall be responsible for compliance of it's subcontractors as provided for herein.

10.3.    Right of Inspection. **NSN** and/or Customer or their respective representatives shall have the right at all times to inspect the performance of the Services at the Sites and to reject any part thereof that does not comply with the terms of this MSA, including all requirements related to quality. For purposes of any quality inspection, **TNS** shall make all relevant documents and adequate personnel and facilities available to **NSN** or its designee. In case of rejection, **TNS** shall immediately rectify such part thereof that is non-compliant. **NSN** and **TNS** will record the results of such visits to continuously improve the quality of the Services. **NSN** will provide the results of such performance evaluations to **TNS** upon **TNS**'s request. Any inspection, checking, approval, or acceptance given on behalf of **NSN** and/or Customer shall not relieve **TNS** from any obligation under this MSA or applicable Amendment and/or Attachment.

10.4.    Quality Audits. **TNS** shall disclose the name and contact details of its material suppliers, subcontractors, and partners to **NSN** that are engaged to support **TNS**'s Services under an Amendment and/or Attachment. In addition to compliance with the terms and conditions of this MSA, agreements with such suppliers, subcontractors or partners must, contain a requirement which enables **NSN** or Customer to carry out quality audits on the premises of such supplier, subcontractor, or partner and anywhere they might be performing Services. Personnel and facilities of **TNS** and any of its subcontractors shall be made available as required by **NSN** or Customer for purposes of the audit.


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

**10.5.** <u>Self-Audits.</u> Quality is of major importance in the delivery of the System, and **TNS** is responsible for the quality of the Implementation Works it carries out pursuant to Purchase Orders. **TNS** is responsible for 100% self auditing of all sites and 100% compliance with **NSN**'s standards. Costs associated with remedial work shall be borne by **TNS**, as shall **NSN**'s costs in identifying defective works.  Sites found non-conforming, with service affecting defects, may be subject to re-audit by **NSN**, and in such an event, **TNS** may be assessed $375 per re-audit.

**10.6.** <u>Testing.</u> Quality checks and tests of installed facilities shall be performed by **TNS** in accordance with documented requirements of **NSN**.

**10.7.** <u>Confidential Documents.</u> **TNS** must nominate a person that will be responsible for receiving controlled copies of **NSN** Information. These controlled copies are subject to **NSN**'s document control service and are constantly updated so that **TNS** always has information which is identical to that which is available to **NSN**. **NSN** is the owner of all **NSN** Information including such documentation, and the documentation must be handled in accordance with the requirements of Article 24, entitled *"Confidential Information."* **TNS** must introduce and maintain an effective method of managing these documents and the contents of these documents so that the applicable versions of the relevant document are available wherever they are required, and that outdated documents are immediately removed from wherever they are used.

**10.8.** <u>Quality Representative.</u> **TNS** shall nominate a quality representative responsible for constant quality assurance in connection with the Services, this MSA, and any applicable Amendment and/or Attachment.

## ARTICLE 11- PRICE AND PAYMENTS

<div style="float:right; border:1px solid; font-size:small">Deleted: ¶</div>

**11.1.** <u>Prices.</u> The prices and payment terms for the Services/Work are set forth in this Article 11 and the relevant Amendments and/or Attachments. The Parties shall meet, if so requested by **NSN**, to review the prices taking into account then current market conditions and the experience gained from the performance of Services. The prices include all costs and expenses incurred in the provision of the Services (e.g., all personnel costs, whether direct or indirect, overheads, profit, supervision, social costs, hand tools, personal transport, communication costs, office costs, minor installation materials, fixings, duties, freight, insurance, packing, transport, storage, unpacking and removal of waste, positioning, Installation, Commissioning and testing, etc.) as well as all other charges, expenses and taxes arising in the Territory or elsewhere with the sole exception of taxes based on the income of **NSN**. Any additional costs and expenses shall be outlined in the applicable Amendment and/or Attachment.

<div style="float:right; border:1px solid; font-size:small">Deleted: [TNS has not received any payment and specific attachments; please forward for your review.]</div>
<div style="float:right; border:1px solid; font-size:small">Deleted: ¶</div>

**11.2.** <u>Competitive Pricing.</u> **TNS** warrants that the prices given to **NSN** shall not exceed the prices charged to other similarly situated customers of **TNS** for the performance of the Services. It is recognized by **TNS** that the ordering of the Services from **TNS** is always subject to the same being competitive terms of pricing, timing, quality, and other aspects of performance. Upon request by **NSN**, an officer of **TNS** shall certify that **TNS** has complied with the provisions of this paragraph 11.2 at a frequency of not more than once per calendar year. Where it is established that **TNS** has not complied with this paragraph 11.2, then **TNS** shall make a price adjustment to remedy any such discrepancies, which shall take into account the duration over which **TNS** failed to comply with this paragraph 11.2.

<div style="float:right; border:1px solid; font-size:small">Deleted: An</div>
<div style="float:right; border:1px solid; font-size:small">Deleted: less</div>

**11.3.** <u>Payment Terms.</u> The currency of this MSA is United States Dollars. The payment terms and invoicing milestones for the Services are set forth in the applicable Amendment and/or Attachment. Unless otherwise agreed, **NSN**, and subject to the provisions of paragraphs 11.4 through 11.11 shall have no obligation to pay **TNS** any amounts invoiced more than six (6) months following the event or milestone giving rise to **TNS**'s right to invoice **NSN** for such amounts, and **TNS** waives any rights it may have to


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

invoice for and collect such amounts.

**11.4** <u>Payment to Subcontractors</u>

TNS shall pay all claims of persons or firms furnishing labor, equipment, or materials used in performing the Work under this MSA <u>in accordance with the terms of applicable agreements between **TNS** and such persons or firms</u>. As a condition precedent to any payment by **NSN**, **NSN** may require **TNS** to submit satisfactory evidence of payment. If there is any evidence of any such unpaid claim, **NSN** may withhold any payment until **TNS** has furnished evidence of payment.

**11.5** <u>Extra Site Visits</u>

In the event **NSN** issues a Notice to Proceed, or such other document advising **TNS** to commence the Works and the Site is not ready for such Works, or **NSN** directs **TNS** to return to the Site, through no fault of TNS, the cost for an Extra Site Visit shall be the responsibility of **NSN**. In the event **TNS** is required to return to the Site, for a reason substantially attributable to **TNS**, the cost of such Extra Site Visit shall be the responsibility of **TNS**. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the Extra Site Visit within seven (7) calendars days of its occurrence, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Extra Site Visit.

**11.6** <u>Pass Through Costs</u>

Pass-Through Costs are those cost incurred by **TNS** for Works/<u>Services</u>, or otherwise, as requested and approved by **NSN** but which are not priced elsewhere within this MSA <u>and which costs are reimbursable to NSN by the Customer</u>. Notwithstanding any provision to the contrary, **TNS** must submit a Change Order for all pass-through reimbursable costs and third party invoices to **NSN** within <u>thirty (30)</u> calendar days following completion of the Works. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the Pass-Through Costs within said <u>thirty (30)</u> calendar days of incurring the costs, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Pass-Through Costs.

**11.7** <u>Change Orders</u>

TNS shall not commence extra works under Article 4, "*Changes*" without the prior issuance of a Purchase Order provided that **NSN** may, at its discretion, direct **TNS**, by e-mail, to perform such extra works and provided that **TNS** shall submit a Change Order Request within <u>thirty (30)</u> calendar days of completion of such extra works. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a Change Order within said <u>thirty (30)</u> calendar days of performing the Works, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the Change Order.

**11.8** <u>Extra Works</u>

In the event **TNS** believes it has performed extra works and/or provided extra materials and/or equipment outside the Scope of Work, **TNS** shall submit a claim within <u>thirty (30)</u> Days of performing such extra works and/or providing extra materials and/or equipment. Notwithstanding anything to the contrary, in the event **TNS** fails/neglects to submit a claim for payment for the extra works and/or providing extra materials and/or equipment said <u>thirty (30)</u> Days of performing the Works/providing the materials/equipment, **TNS** expressly waives its right to compensation and **TNS** will not be paid for the extra works/materials and/or equipment.

**Deleted:** [Note—to be discussed. TNS has not received attachments that address the mechanics of the payment and invoicing terms. Please forward for our review. We would request, to the extent any payment terms are consistent across Purchase Orders, that such terms be addressed in this MSA rather than an attachment.]

**Deleted:** promptly, within twenty-one (21) calendar days of receipt of payment from NSN,

**Deleted:** thirty (30

**Deleted:** ¶

**Deleted:** services

**Formatted:** Underline, Font color: Blue

**Deleted:** fourteen (14

**Deleted:** fourteen (14

**Deleted:** fourteen (14

**Deleted:** fourteen (14

**Deleted:** twenty-one (21

**Deleted:** twenty-one (21



**Nokia Siemens Networks**

Contract Number XXXXXX-XXXX

**11.9   Adjustments**

All prices are fixed for the duration of the identifiable project and are not subject to escalation for any reasonable cause during that period.  Payment of the Unit Rates/Hourly Rates shall constitute full payment for performance of the Work and covers all reasonable costs of whatever nature incurred by **TNS** in accomplishing the Work in accordance this MSA, attached Appendices, Amendments and/or Attachments.

**11.10   Acceptance**

No payment of invoices or portions thereof shall at any time constitute approval or acceptance of any Works under this MSA, Appendices, Amendments and/or Attachments, nor be considered a waiver by **NSN** or Customer of any of the terms of this MSA.  However, title to all equipment and materials for which payment has been made, whether or not the same has been incorporated in the Work, and title to all completed Works whether paid for or not, shall vest in **NSN**, or Customer as the case may be, and in any case shall not be part of **TNS's** property or estate in the event **TNS** is adjudged bankrupt or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of **TNS's** insolvency, or if this MSA, Amendment and/or Attachment is terminated.

**11.11   Supporting Documentation**

The submission of any claim for an Extra Site Visit, Pass-Through Costs, Change Orders, Extra Works, or any other claim for payment by **TNS**, shall be supported by all documentation/data as may be reasonably requested by **NSN**.

**ARTICLE 12 - AUDIT RIGHTS**

**12.1**   During the term of this MSA and for three (3) years thereafter, employees of **NSN**, at its cost, and its public auditors may audit the accuracy of **TNS's** charges to **NSN** and verify that the Services have been or are being performed in accordance with this MSA and applicable Appendices, Amendments and/or Attachments.

**12.2**   **NSN** designated personnel will be provided with reasonable access to books and records and facilities which are related to this MSA and **TNS's** activities and billings hereunder. Such audits may be conducted at any time during normal business hours upon reasonable prior notice by **NSN** to **TNS**. **TNS** will cooperate in the audit, will make the information reasonably required to conduct the audit available on a timely basis and will provide reasonable assistance to the representatives of **NSN** conducting the audit.

**12.3**   With respect to the amounts chargeable to and payments made by **NSN** under this MSA, **TNS's** records shall be kept in accordance with generally accepted accounting principles applied on a consistent basis.

**12.4**   Following each audit, **NSN** will notify **TNS** of any issues identified in the audit that pertain to **TNS** and its performance under this MSA. Within ten (10) Working Days following such notice from **NSN**, **TNS** will submit to **NSN** a corrective action plan for any deficiencies in **TNS's** performance of the Services identified in the audit, and will correct any identified deficiencies at no cost to **NSN**. **TNS** will remit to **NSN** any undisputed overcharges paid by **NSN** to **TNS** that are identified in the audit within thirty (30) Days following **NSN's** notification of such overcharges. If the overcharges are more than five percent (5%) of the amount that should have been paid by **NSN**, **TNS** shall also remit to **NSN** interest on such overcharges equal to the lesser of (i) two percent per annum more than the prime rate established from time to time by Citibank N.A., New York on the date on which **NSN** notified **TNS** of the overcharge, or (ii)

> **Formatted:** Underline, Font color: Blue



Contract Number XXXXXX-XXXX

the maximum rate of interest allowed by applicable law. Such interest will be applied during the period of time between when **NSN** made the overcharge payment to **TNS** and **TNS** subsequently remitted the overcharge to **NSN.**

## ARTICLE 13 - MECHANIC'S LIENS

13.1.  No Lien Rights. In addition to the **TNS's** obligations set forth under paragraphs 13.2 and 13.3, as a material inducement to **NSN** for entering into this MSA, subject to **NSN's** payment to **TNS** of all undisputed amounts due and payable to **TNS** under this MSA, TNS agrees and acknowledges that it will file no lien (and, to the fullest extent permitted by applicable law, waives all rights to file a lien) against any of the Services, Material, Equipment and/or Sites which are the subject of this MSA or any Amendment and/or Attachment. **TNS** hereby waives and releases all lien rights, whether statutory or constitutional, equitable, contractual or otherwise available under common law or equity. **TNS** also agrees to obtain an agreement and lien rights waiver from each subcontractor and/or supplier with whom it does business in connection with this MSA on terms no less strict than those contained herein. **TNS** agrees and understands that such a waiver is of great importance to **NSN**, that the ownership interests and rights associated with the Services, Material, Equipment and Sites are complex, and that lien claims filed against same are likely to cause serious damage to **NSN, NSN's** Customers and third parties. **TNS** further agrees that its sole recourse for payment under this MSA and in connection with any Amendment and/or Attachment will be against **NSN** only. **TNS** agrees to sign any additional documents that **NSN** may reasonably request to verify or perfect the agreements in this Article 13, this MSA and any Appendices, Amendments and/or Attachments; provided that such documents are on terms mutually acceptable to the Parties and do not alter the rights or obligations of the Parties under this MSA.

13.2.  Removal of Liens/Final Waiver of Lien/Payment to Subcontractors. **TNS** will pay its subcontractors for all services, materials, equipment and labor used under this MSA in accordance with the terms of the applicable agreements with such subcontractors and will keep **NSN's** and Customer's real or leasehold property and all Sites free of claims or liens. **TNS** will submit to **NSN** a signed and notarized Waiver and Release of Liens substantially in the form attached as Appendix 4, "*Final Waiver of Lien*", and/or Appendix 5, "*Release and Certificate of Payment*" modified to comply with applicable state law, executed by **TNS** and all its subcontractors of all tiers at such intervals as **NSN** may, at its discretion, determine. **TNS** agrees to indemnify and defend **NSN** from and against any lien claims and to discharge any lien or furnish an indemnity bond equal to the amount required by law within fifteen (15) days of notice from **NSN** of the presence of any lien. **NSN** will be entitled to pay any lien claim not discharged as required by this Article 13 and to charge the amount so paid against amounts due **TNS.**

**NSN** reserves the right to make direct payment to **TNS's** subcontractors and deduct the payment from amounts due **TNS** or to make payments jointly to **TNS** and its subcontractors as **NSN** determines necessary to protect **NSN's** rights under this MSA or to protect any Site from liens. Nothing in this Article 13 will create any obligation on the part of **NSN** to make any payment to any of **TNS** subcontractor and no payment by **NSN** to any of **TNS** subcontractors will create any obligation to make any further payment to this subcontractor.

13.3  Sworn Statement. THE LAW IN SOME JURISDICTIONS REQUIRES THAT **TNS** SHALL SUBMIT A SWORN STATEMENT OF PERSONS FURNISHING MATERIALS AND LABOR BEFORE ANY PAYMENTS ARE REQUIRED TO BE MADE TO **TNS**. Upon the request of **NSN, TNS** shall provide **NSN** with a sworn statement, substantially in form attached as Appendix 6, "*Contractor's Affidavit*," of the names and addresses of all Parties' furnishing materials and/or labor and the amounts due or to become due to each.

## ARTICLE 14 – WARRANTIES

| | |
|---|---|
| **Deleted:** promptly | |
| **Deleted:** within twenty-one (21) calendar days of receipt of payment from NSN and | |
| **Deleted:** Subject to NSN's payment to TNS of all undisputed amounts due and payable to TNS under this MSA, | |



Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

14.1  Generally. **TNS** warrants that:

(a)  it has the personnel and other resources with the necessary skills and experience to fulfill **TNS's** obligations under this MSA;

(b)  all personnel of **TNS** and of **TNS's** subcontractors involved in the performance of the Services have all necessary professional qualifications and shall at all times behave in a professional manner whether at Site or when in contact with the Customer or otherwise;

(c)  the Services shall be performed with due care and skill and in accordance with the relevant laws, regulations, national standards, Orders, this MSA, the applicable Amendment and/or Attachment, and **NSN's** instructions, procedures, processes and documentation that have been communicated to **TNS** in writing, and that after the Services have been performed, the Equipment will be free of any defects in engineering and workmanship arising in connection with the Services; and *[Note: in connection with the warranty for engineering defects, we need to receive NSN's E&O policy limits in Appendix 7, which are not filled out.]*

(d)  all Materials supplied in connection with the Services shall be (i) of good and merchantable quality; (ii) fit for the System; (iii) new and not previously used; and (iv) free from defects in engineering, workmanship and Installation.

14.2  Warranty Period. The warranty period is twelve months from the date of **NSN** Acceptance, or in respect of replaced or repaired parts, twelve (12) months from such repair or replacement, which period, however, shall not expire prior to the expiry of the original warranty period. If **NSN** notifies **TNS** in writing during the warranty period of any failure of the Services to comply with any of the warranties under paragraph 14.1, then **TNS** shall at its own cost promptly and in any event within five (5) Working Days of such notification commence correction of all such failures in the Services or repair/replace the defective Materials unless such failure is service affecting and in such an event, such repair/replace shall be implemented with twenty-four (24) hours of notice. If **TNS** does not comply with its obligations regarding such failures within the foregoing periods, then **NSN** may, at its option and in addition to any other rights or remedies it may have, take action to have the failures corrected by a third party at **TNS's** expense. **TNS** agrees that failures repaired by third parties, and Services performed by third parties at Sites or in a Zone where **TNS** has performed or will perform Services, shall not void any **TNS** warranties unless **TNS** proves reckless or intentionally wrongful misconduct by said third parties should result in the voiding of a specific and relevant warranty, or if said third party does not comply with similar training and SEP requirements in Article 9, and any other training or certification protocols.

| Deleted: three (3) |
| Deleted: correct |
| Deleted: d |

14.3  Title. Upon delivery of invoice, **TNS** represents and warrants (i) **NSN** shall have title to drawings, designs, equipment, materials, and any other items delivered pursuant to such Purchase Order free and clear of any and all liens and encumbrances of any kind and (ii) **TNS** has all requisite authority and has obtained all authorizations required by law or under any agreement from any and all third parties necessary for **TNS** to grant **NSN** the rights and interests in the Deliverables.

14.4  Subcontractors' and Manufacturers' Warranties. **TNS** shall assign all subcontractors', manufacturers' or other warranties on any and all materials, equipment and services delivered to **NSN** and/or Customer by **TNS** (if any) to the extent assignable to **NSN** and/or Customer on demand and in no event later than delivery of the material, equipment or service. **TNS** shall use commercially reasonable efforts to make all such warranties assignable to **NSN**.



Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

14.5   NSN shall provide **TNS** with written notice of any alleged or claimed breach of the foregoing warranty ("Notice of Breach") within one hundred eighty (180) Days after discovery thereof.

## ARTICLE 16 – INDEMNITIES

16.1   <u>By NSN.</u> **NSN** will indemnify **TNS**, its officers, directors, employees, agents, successors and assigns <u>(each, a "TNS Indemnified Party")</u>, from, and defined such parties against, any liability (including judgments and settlements) or expenses (including reasonable attorneys' fees and expenses, court costs and other litigation expenses) <u>to the extent</u> arising out of or relating to any claim brought by a third party against such parties<u>, but excluding any liability or expenses resulting from any acts or omissions of any TNS Indemnified Party</u>:

   (a)   that the **NSN** Information (other than **NSN** Information developed by or under Specifications or other specific instructions of Customer or **TNS**) infringes or contributory infringes upon the proprietary rights of any third party, except to the extent that such infringement is caused by (i) **TNS**'s failure to use such **NSN** Information in accordance with the terms of this MSA and any related documentation provided to **TNS** or modification thereof not made by or pursuant to Specifications or other specific instructions furnished by NSN, (ii) **TNS**'s failure to use corrections or modifications thereof provided by **NSN**, (iii) **TNS**'s use thereof in combination with a product or information not furnished by or obtained at the specific instruction of NSN, or (iv) information, directions, Specifications or Materials provided by TNS;

   (b)   relating to the inaccuracy or untruthfulness of any representation or warranty of **NSN** contained in this MSA;

   (c)   relating to **NSN**'s breach of any of its obligations under this MSA; and

   (d)   relating to personal injury (including death) or damage to property resulting from **NSN**'s acts or omissions.

16.2   <u>By TNS.</u> **TNS** will indemnify **NSN** and Customer and their officers, directors, employees, agents, successors and assigns <u>(each, an "NSN Indemnified Party")</u>, from, and defend such parties against, any liability (including judgments and settlements) or expenses (including reasonable attorney's fees and expenses, court costs and other litigation expenses) <u>to the extent</u> arising out of or relating to any claim brought by a third party against such parties<u>, but excluding any liability or expenses resulting from any acts or omissions of any NSN Indemnified Party</u>.

   (a)   that the Services, Materials, Work Product, Pre-existing Materials, any enhancements or modifications to the **NSN** Information performed by or under the specifications or other specific instructions **TNS**, or any other resources or items provided to **NSN** by **TNS** infringe or contributory infringe upon the proprietary rights of any third party, except to the extent that such infringement is caused by (i) **NSN**'s failure to use such item in accordance with the terms of this MSA and any related documentation provided to **NSN** or modifications thereof not made by or pursuant to specifications or other specific instructions furnished by TNS, (ii) **NSN**'s failure to use corrections or modifications thereof provided by **TNS**, (iii) **NSN**'s use thereof in combination with a product or information not furnished by or obtained at the specific instruction of **TNS**, or (iv) information, directions, specifications or materials provided by NSN;

   (b)   <u>relating to any duties or obligations of **TNS** under an agreement between TNS and any third</u>

---

**Deleted:** ARTICLE 15 - PERFORMANCE BOND

**Deleted:** , PARENT COMPANY GUARANTEE AND BANK GUARANTEE

**Deleted:** ¶
¶
15.1 . Performance Bond - If required by NSN, TNS shall submit to NSN an irrevocable, unconditional, on-demand Performance Bond within fourteen (14) Days prior to commencement of the Work. The costs of such bond shall be at the expense of NSN. The Performance Bond shall be equal to ten percent (10%) of the estimated value of the Work provided that the estimated value, increase or decrease, shall be reviewed not less than annually, and issued in a form and by a first class bank acceptable to NSN as security against any default under this MSA by TNS. The Performance Bond shall remain valid until

**Deleted:** twenty-five (25) months from

**Deleted:** the earlier of (i) the date this MSA is terminated or expires or (ii) the date of Acceptance. In the event TNS fails to complete any Work in accordance with this MSA or any applicable Scope of Work, NSN shall be entitled to recover, under the Performance Bond, all costs incurred in retaining an alternative contractor to complete such Work Task as quickly as possible, up to the full amount of the performance bond. NSN shall be entitled to recover actual damages incurred from such delay in excess of the amount of the Performance Bond, if any, directly from TNS.

**Deleted:** ¶
15.2 . Parent Company Guarantee - if required by NSN, TNS shall provide a Parent Company Guarantee to NSN. The Parent Company Guarantee shall be in a form acceptable to NSN and shall remain valid until any and all obligations of TNS remain unsettled under this MSA.¶
¶
15.3 . Bank Guarantee – If required by NSN, TNS shall provide an unconditional and irrevocable bank guarantee, in a form drawn on a bank reasonably acceptable to NSN, in an amount not to exceed ten percent (10%) of the estimated value of this MSA and for the purpose of this MSA, the agreed upon estimated value is [...1]

**Deleted:** ;

**Formatted:** Underline, Font color: Blue



Contract Number XXXXXX-XXXX

party;

(c)   relating to the inaccuracy or untruthfulness of any representation or warranty of **TNS** contained in this MSA;

      [Formatted: Bullets and Numbering]

(d)   relating to **TNS**'s breach of any of its obligations under this MSA;

      [Formatted: Bullets and Numbering]

(e)   relating to personal injury (including death) or damage to property resulting from **TNS**'s acts or omissions or the acts or omissions of **TNS**'s employees or subcontractors; and

      [Formatted: Bullets and Numbering]

(f)   relating to all claims to the extent resulting from any acts or omissions of **TNS** that are brought under common law or statute, including, but not limited to, strict tort liability, strict products liability, negligence, misrepresentation, or breach of warranty, except to the extent that **NSN** is primarily responsible.

      [Formatted: Bullets and Numbering]
      [Formatted: Underline, Font color: Blue]

16.3   Indemnification Procedures. To be indemnified under this Article 16, the Party claiming indemnification must notify the other Party in writing of any claim or suit for which indemnification is sought as soon as reasonably possible and in no event more than sixty (60) days of the claim, provide reasonable cooperation (at the non-indemnifying Party's expense) and tender full authority to defend or settle the claim or suit.

      [Formatted: Underline, Font color: Blue]

16.4   Settlement. Neither Party has any obligation of indemnity in connection with any settlement made without its written consent. The indemnified Party has the right to participate, at its own expense, in the claim or suit and in selecting counsel.

## ARTICLE 17 - DAMAGES

17.1   Consequential Damages. NEITHER PARTY WILL BE LIABLE FOR, NOR WILL THE MEASURE OF DAMAGES INCLUDE, ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR AMOUNTS FOR LOSS OF INCOME, PROFITS OR SAVINGS ARISING OUT OF OR RELATING TO ANY CLAIM OR OTHER MATTER (WHETHER IN CONTRACT, TORT OR OTHERWISE) INCLUDING, WITHOUT LIMITATION, THEIR PERFORMANCE OR FAILURE TO PERFORM UNDER THIS MSA OR ANY AMENDMENT AND/OR ATTACHMENT.

17.2   Exclusions. The limitations of liability set forth in paragraph 17.1 shall not apply to (i) indemnification claims set forth in Article 16, (ii) the amounts included within the liquidated damages set forth in Section 20.1, or (iii) damages suffered or losses incurred by **NSN** or **TNS** in connection with the gross negligence or willful misconduct of the other Party.

      [Deleted: "Indemnities", paragraph 16.2,]
      [Deleted: breaches of Article]
      [Deleted: , "Delays", and Article 21, "Term and Termination"]

## ARTICLE 18 - INSURANCE

18.1   Insurance Requirements. **TNS** shall comply with the **NSN** Minimum Insurance Requirements stated in Appendix 7, "Insurance Requirements," and, in addition, **TNS** shall provide any supplemental/additional Insurance mandated by the Customer. **TNS** shall provide **NSN** with a Certificate of Insurance upon contract signature or not later than the date for commencement of the Works and which Certificate of Insurance shall identify **NSN** as "additional insured."

## ARTICLE 19 - DOCUMENTATION


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

19.1   Documentation. **TNS** shall at its expense immediately correct all discrepancies, errors, or omissions in drawings and other documentation provided by **TNS** to **NSN** hereunder. Such correction shall be without prejudice to any other rights **NSN** may have as a consequence of such discrepancies, errors, and omissions by law or under this MSA.

19.2   NSN Information. All **NSN** Information delivered hereunder shall be checked by **TNS** and any errors shall be notified to **NSN** immediately.

19.3   Updating of Tools. The **TNS** shall appoint a person for each Zone, and identify that person to **NSN**, who will be responsible for updating **NSN** database tools per the requirements of the Amendments and/or Attachments.

## ARTICLE 20 – DELAYS

20.1   TNS Delay. If completion of the Work is delayed beyond the Time for Completion set forth in the applicable Purchase Order for reasons primarily attributable to TNS, then TNS shall pay liquidated damages to NSN, calculated on the basis of the price of the delayed Services at the rate set forth in the applicable Purchase Order for each week of delay (and pro-rata for any part thereof) up to a maximum of twenty percent (20%) of the price of the delayed Services. Delayed Services shall include any Services that are completed but cannot be brought into use because of a delay in other Services.

> Deleted: Acceptance
>
> Deleted: , without prejudice to any other rights and remedies available to NSN,
>
> Deleted: of two percent (2%) per
>
> Deleted: of delay

20.2.   Right to Cancel. If the delay attributable to **TNS** continues for a period exceeding fifteen (15) Days, in addition to any other rights **NSN** may have, **NSN** shall be entitled to terminate the relevant Order, Amendment and/or Attachment for material breach.

20.3   NSN Delay. **TNS** shall not be liable for delays that are solely attributable to **NSN** or a third party. When **TNS** encounters a delay which in its reasonable opinion is attributable to **NSN** or a third party, it shall inform **NSN** accordingly within one five (5) Working Days and shall also advise **NSN** within the same time period of a reasonable approximation of the effect of such delay on the time schedule and the Time for Completion of the Services. **TNS** shall use its commercially reasonable efforts to recover from any such delays.

> Formatted: Underline, Font color: Blue
>
> Deleted: (1
>
> Deleted: Day
>
> Deleted: best

## ARTICLE 21 – TERM AND TERMINATION

21.1.   Initial Term. This MSA becomes effective on the Effective Date, and shall, unless earlier terminated in accordance with this MSA, shall remain valid for a term three (3) years, and thereafter until all related obligations hereunder have been duly performed. After the Initial Term, **NSN** shall have the option to renew this MSA on the terms set forth herein for subsequent one (1) year terms b y giving **TNS** notice of its intention to renew not less than thirty (30) calendar days prior notice to the expiration of the then current term. In the event of expiration or termination of this MSA, the terms of this MSA shall nonetheless survive and continue in effect with respect to any Orders which have not also expired or been terminated.

21.2.   Termination for Breach. If either Party is in default of a material obligation under this MSA and fails to remedy such default within thirty (30) Days from the date of the other Party's written notice drawing the attention of such Party to the default and requiring the same to be remedied; then the non-defaulting Party shall have the right to terminate this MSA. In the event of bankruptcy, receivership or comparable procedure of a Party, then the non-defaulting Party may terminate this MSA forthwith.

21.3.   Cancellation or Termination of Customer Contract. In the event that a Customer Contract is cancelled or



terminated for any reason, then **NSN** may immediately terminate the relevant Amendment and/or Attachment and any or all Orders issued forthwith. **TNS** shall be compensated if **NSN** is compensated by Customer for any such cancellation or termination proportionally.

21.4.   Termination for Convenience. Either Party shall have the right to terminate any or all Orders, this MSA, <span>┄┄┄┄</span> [Deleted: NSN]
and any Amendment and/or Attachment, in whole or in part, for its convenience upon thirty (30) Days
prior written notice to the other Party. In such event, **TNS** shall promptly, and in no event later than the <span>┄┄┄</span> [Deleted: TNS]
date of expiry of said notice period, cease all relevant Services. **TNS** shall be paid in full for (a) all Services
duly completed and Accepted by **NSN** under this MSA and the applicable Appendices, Amendments
and/or Attachments, (b) all Services that may be in process at the time of termination based on the
percentage the applicable milestone, deliverable or task has been completed, as negotiated and agreed
by the Parties in good faith, and (c) all additional direct and documented costs and expenses incurred by
**TNS** and which **TNS** cannot mitigate, as a result of the early termination of such services (e.g.,
termination of leases, equipment rentals, demobilization costs, etc.). In addition, **TNS** shall be paid for
additional Services specified by **NSN** in writing and shall receive payment for such Services in proportion
to the amount of Services rendered. In all cases where a claim for compensation is made by **TNS**
hereunder, such claim must be submitted to **NSN** with supporting documentation within forty-five (45)
Days of receipt of notice of termination or later for particular Services if agreed in writing by the Parties. In
no event shall such compensation exceed the payments that would have been made to **TNS** under the
relevant terminated Orders. **NSN** shall not be obligated to pay the compensation to **TNS** set forth in item
(c) above in the event that termination has been due to material breach by **TNS** under paragraph 21.2
above of an Order, this MSA, Appendix, Amendment and/or Attachment.

21.5   Procedure Upon Termination.

Upon receipt of a notice of termination of all or any portion of the Work under some or all Purchase
Orders, under paragraph 21.2, or termination of the entire MSA and all Work under all Purchase Orders
under paragraph 21.3, **TNS** shall do the following (to apply only to the portion of the Work terminated and
not the entire MSA if a portion has been terminated under paragraph 21.2):

(a)   Stop Work under this MSA on the date such notice of termination is received and to the extent
specified in the notice of termination, except those services that are reasonably necessary to be
provided in connection with a termination of this MSA;

(b)   Place no further orders or subcontracts for materials, services, or facilities to the extent they relate
to the performance of the Work terminated;

(c)   Terminate subcontracts to the extent they relate to the performance of the Work terminated;

(d)   Settle all outstanding liabilities and all claims arising out of any termination of subcontracts for
materials, equipment, or services in accordance with the applicable terms of such subcontracts;

(e)   Take such action as may be reasonably necessary, or as **NSN** may direct, for the protection and
preservation of the property related to this MSA that is in the possession of **TNS** or any **TNS**
subcontractor and in which **NSN** has or may acquire an interest;

(f)   Submit a written final status report detailing the progress made toward completion of the Purchase
Order, and any items of the Purchase Order not yet performed; and

(g)   Complete all wind-down activities at **TNS**'s headquarters within sixty (60) Days after the effective



Contract Number XXXXXX-XXXX

date of termination.

21.6   In the event of termination (other than by reason of **TNS's** material breach of this MSA), **TNS** shall be entitled to payment for:

(a)   Work-in-progress that has not been completed as of the date specified in the notice of termination, with the payment equal to a percentage of the applicable Work Payment Price(s) that is equal to the percentage of Works, as determined by the Parties, actually completed; and

**Deleted:** effective

(b)   any and all reasonable and documented wind-down expenses incurred by **TNS** as a result of early termination. **TNS** shall submit an invoice to **NSN** for amounts due under this Section on a monthly basis, provided **TNS** shall use commercially reasonable efforts to invoice for all amounts due within forty-five (45) calendar days of the effective date of termination. No invoices shall be submitted later than ninety (90) calendar days after the effective date of termination.

**Deleted:** best

(c)   The amounts payable by **NSN** under paragraph 21(b) shall be verified at **NSN's** request and expense by a nationally recognized firm of certified public accountants appointed by **NSN** and reasonably acceptable to **TNS**. **TNS** shall be entitled to payment by **NSN** of undisputed amounts in such invoice within thirty (30) Working Days after **NSN's** receipt of the invoice. Payment of the amount payable by **NSN** to **TNS** pursuant to this paragraph 21.6(c) above shall constitute a total discharge of **NSN's** liabilities to **TNS** for termination under this Article 21.

**Deleted:** sixty (60) business days

21.7   Upon payment in full of all amounts outstanding under this MSA, **NSN** may require **TNS** immediately to transfer to **NSN** in the manner and to the extent directed by **NSN**, title to and possession of any items comprising all or any part of the Work terminated (including all Work-in-progress, deliverables, subcontracts and associated warranties). **TNS** shall, upon direction of **NSN** and at **NSN's** expense, use commercially reasonable efforts to protect and preserve property in the possession of **TNS** or its subcontractors in which **NSN** has an interest and shall facilitate access to and possession by **NSN** of deliverables comprising all or part of the Work terminated.

21.8   Suspension by Customer. If at any time a competent governmental authority revokes or suspends a Customer's license to construct or operate the System, or if a Customer for any reason instructs **NSN** to stop or suspend work for a period of time, then **NSN** may require that **TNS** stop or suspend the relevant Services. At such time when **NSN** is instructed by the Customer to proceed with the work, **NSN** shall issue a new time schedule for the performance of the Services in question. **NSN** shall also compensate **TNS** as provided under paragraph 21.6 for any direct costs resulting from such rescheduling and that **TNS** cannot otherwise mitigate. In all cases where a claim for compensation is made by **TNS** hereafter, such claim must be submitted to **NSN** with supporting documentation within fourteen (14) Days of issuance of the new time schedule. In no event shall such compensation exceed the payments that would have been made to **TNS** in the absence of such rescheduling.

## ARTICLE 22 - FORCE MAJEURE

**Deleted:** ¶
¶

22.1   Force Majeure Event. If and to the extent that a Party's performance of any of its obligations pursuant to this MSA is prevented, hindered or delayed directly or indirectly by events beyond such Party's control, including but not limited to fire, flood, earthquake, tornadoes, hurricanes, elements of nature or acts of God, acts of war, terrorism, sabotage, riots, civil disorders, nationwide strikes or acts of a governmental entity that were not requested, promoted or caused by the affected Party (each, a "Force Majeure Event"), and such nonperformance, hindrance or delay could not have been prevented by the taking of all reasonable precautions by the non-performing, hindered or delayed Party, then the nonperforming,

**Deleted:** or



hindered or delayed Party will be excused for such nonperformance, hindrance or delay, as applicable, of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use efforts consistent with industry standards and practices to promptly recommence performance, including through the use of alternate sources, workaround plans or other means. The Party whose performance is prevented, hindered, or delayed by a Force Majeure Event will promptly notify the other Party by telephone (confirmed in writing as soon as possible following the inception of the delay) of the occurrence of the Force Majeure Event, describing in reasonable detail the nature of the Force Majeure Event. It is expressly agreed that strikes and union disputes, other than national strikes, are not to be considered an event of Force Majeure.

| | Deleted: all |
| --- | --- |
| | Deleted: of any kind |

22.2    **No Liability.** Neither Party shall be liable to the other for any delay or nonperformance of its obligations hereunder in the event and to the extent that such delay or nonperformance is due to a Force Majeure Event; provided that a Force Majeure Event shall not prevent or delay a Party's obligation to make payments to the other Party that are due and payable hereunder.

22.3    **Suspension.** The Party whose performance is prevented, hindered or delayed by a Force Majeure Event may suspend such performance under the Order, in whole or in part, for the duration of the Force Majeure Event and resume performance under the Order once the Force Majeure Event ceases, with an option to extend the Time of Completion up to the length of time the contingency is endured.

22.4    **Termination.** If the performance of any Services becomes substantially suspended as the result of a Force Majeure Event for a continuous period exceeding one (1) month, then either Party shall have the right to cancel the Order under which the delayed Services are being performed or this MSA in respect of the unperformed part thereof. However, **TNS** shall be compensated as provided for in the relevant Order for Services which have been completed up to the date of cancellation.

## ARTICLE 23 - INTELLECTUAL PROPERTY RIGHTS

23.1    **NSN Intellectual Property and NSN Information.** TNS acknowledges and accepts that all **NSN** Intellectual Property and all **NSN** Information that is provided to **TNS** under or in connection with this MSA is and shall remain the exclusive property of **NSN** and its licensors, whether or not specifically recognized or perfected under applicable law. **NSN** (and/or its licensors) will own all rights in any copy, translation, modification, adaptation, or derivation of the **NSN** Intellectual Property or the **NSN** Information, including any improvement or development thereof.

23.2    **License.** NSN hereby grants to TNS a personal, non-exclusive, non-transferable, royalty-free license to use the **NSN** Information solely for the performance of the Services. **TNS** will not use or copy the **NSN** Information for any other purpose than for the performance of the Services under this MSA or take any other action that jeopardizes NSN's rights in the **NSN** Intellectual Property or the **NSN** Information.

23.3    **Termination of License.** TNS's right to use the **NSN** Information will terminate automatically upon the expiry or termination of this MSA. TNS shall, upon the expiry or termination of this MSA, (i) make no further use of the **NSN** Information; (ii) promptly return to **NSN** all **NSN** Information and any and all copies thereof; and (iii) submit to **NSN** a properly signed and executed written document stating that all **NSN** Information that is in writing or in any other tangible form that has been disclosed to **TNS** by NSN, as well as any and all copies thereof, have been returned to **NSN**.

23.4    **Work Product.** All Work Product developed as a part of the performance of Work hereunder, wherever located, shall belong exclusively to **NSN** and shall, to the extent possible, be considered a work made for hire for **NSN** within the meaning of Title 17 of the United States Code. TNS hereby assigns, and



Contract Number XXXXXX-XXXX

automatically assigns at the time of creation of the Work Product, without any requirement of further consideration, any and all right, title, or interest in such Work Product, including any patents, copyrights or other intellectual property rights pertaining thereto and any and all rights to use, copy, distribute, sublicense, make and have made the Work Product. Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be referred to as "moral rights." Upon request of **NSN**, **TNS**, at NSN's expense, shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment. If any Pre-Existing Materials are embedded in any Work Product, **TNS** hereby grants to **NSN** a perpetual, royalty-free, transferable, nonexclusive license to use such embedded Pre-Existing Materials solely in connection with the use and exploitation of such Work Product and only so long as such Pre-Existing Materials remain embedded in such Work Product and are not separated there from.

**ARTICLE 24 - CONFIDENTIAL INFORMATION**

24.1   Defined. "Confidential Information" means:

(a)   technical, financial and commercial information and data relating to a Party's or Customer's respective businesses, finances, planning, facilities, products, techniques and processes and shall include, but is not limited to, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, tracings, diagrams, models, samples, flow charts, data, computer programs, disks, diskettes, tapes, marketing plans, customer names, pricing and other technical, financial or commercial information and intellectual properties, whether in written, oral or other tangible or intangible forms;

(b)   **NSN** Intellectual Property;

(c)   **NSN** Information;

(d)   **TNS** Information;

(e)   Pre-Existing Materials; and

(f)   Information that relates to this MSA or the Services.

24.2   Standard of Care. The Recipient shall protect Confidential Information from disclosure to third Parties using the same degree of care used to protect its own confidential or proprietary information of like importance, but in any case using no less than a reasonable degree of care. Recipient may disclose Confidential Information received hereunder to its agents, employees, and contractors who have a need to know, for the purpose of this MSA, and who are bound to protect the received Confidential Information from unauthorized use and disclosure under this MSA. Confidential Information shall not otherwise be disclosed to any third party without the prior written consent of the Owner.

**Deleted:** Note that terms "Owner" and "Recipient" should be defined.

24.3   Exceptions. The restrictions of this MSA on the use and disclosure of Confidential Information shall not apply to information that:

(a)   was publicly known to a third party at the time of Owner's communication thereof to Recipient;

(b)   becomes publicly known to a third party through no fault of Recipient subsequent to the time of Owner's communication thereof to Recipient;

(c)   was in Recipient's possession free of any obligation of confidence at the time of Owner's communication thereof to Recipient;

(d)   is developed by Recipient independently of and without reference to any of Owner's Confidential Information or other information that Owner disclosed in confidence to any third party;

(e)   is rightfully obtained by Recipient from a third party that, to the best of Recipient's knowledge, is authorized to make such disclosure without restriction;

(f)   is identified by Owner as no longer proprietary or confidential;

(g)   is disclosed to its attorneys, auditors, insurers, subcontractors and employees who have a need to


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

have access to such Confidential Information in connection with their employment (or engagement, if applicable) by the receiving Party, so long as the receiving Party requires, in the case of its auditors, insurers and subcontractors, that each of them execute a confidentiality agreement containing terms and conditions no less restrictive than those set forth in this Article 24 and advises, in the case of its employees, each such employee of the confidentiality obligations set forth in this Article 24; or

| Deleted: attorneys, |

(h)   is disclosed by NSN to the Customer in connection with the performance of NSN's undertakings under the Customer Contract.

24.4   Defacement. The receiving Party will not allow the removal or defacement of any confidentiality or proprietary notice placed on items of the disclosing Party's Confidential Information.

24.5   Disposition of Confidential Information.   The receiving Party shall immediately upon notice from the disclosing Party destroy the disclosing Party's Confidential Information; provided that, the disclosing Party agrees that such Confidential Information is required by the receiving Party in connection with its performance of this MSA. In any event, each Party's right to use the Confidential Information of the other Party will terminate automatically and with immediate effect upon the expiry or termination of this MSA. Each Party shall upon the expiry or termination of this MSA (a) make no further use of the Confidential Information of the other Party; (b) either promptly return to the other Party or destroy all of the other Party's Confidential Information and any and all copies thereof; and (c) submit to the other Party a properly signed and executed written document stating that all of the other Party's Confidential Information that is in writing or in any other tangible form, as well as any and all copies thereof, have been either destroyed or returned to the other Party; provided, however, with respect to clauses (b) and (c), the Parties expressly agree that Recipient may retain (subject to all other restrictions contained in this Agreement) any such Confidential Information that exists only as part of regularly generated electronic backup data, the destruction of which is not reasonably practicable; provided that Recipient may retain such material to the extent necessary to comply with applicable law, regulation or bona fide document retention policies.

| Deleted: . ¶ |

24.6   Term. The confidentiality undertakings of this Article 24 shall bind the Parties during the term of this MSA and for a period of one (1) year thereafter.

| Deleted: five (5) years |

24.7   Use of Marks. No name, logo, and/or trademark of NSN or its affiliates, may be used by TNS for any purpose without the prior written approval of NSN. Any publicity or advertising, in connection with any Services and/or this MSA or the Customer Contract, shall be subject to the prior written consent of NSN.

24.8   Required Disclosure. If Recipient is required by law, regulation, or court order to disclose any of Owner's Confidential Information, Recipient will promptly notify Owner in writing prior to making any such disclosure in order to facilitate Owner seeking a protective order or other appropriate remedy from the proper authority. Recipient agrees to cooperate with Owner in seeking such order or other remedy. Recipient further agrees that if Owner is not successful in precluding the requesting legal body from requiring the disclosure of the Confidential Information, it will furnish only that portion of the Confidential Information which is legally required and will exercise all reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information.

24.9   Ownership. All Confidential Information disclosed under this MSA (including information in computer software or held in electronic storage media) shall be and remain the property of Owner.

24.10   Residuals. Subject to the provisions of this Article 24, neither Party is restricted from incidentally using any general operational ideas, concepts, know-how or techniques that are mentally retained in the



**Nokia Siemens Networks**

Contract Number XXXXXX-XXXX

unaided memories of the receiving Party's employees (and not intentionally memorized for the purpose of later recording or use) (the "Residual Knowledge").

24.11    Injunctive Relief. The Parties acknowledge that Confidential Information is unique and valuable, and that disclosure in breach of this MSA will result in irreparable injury to Owner for which monetary damages alone would not be an adequate remedy. Accordingly, the Parties agree that in the event of a breach or threatened breach of confidentiality, the Owner shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or anticipated breach without the necessity of posting a bond. Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of monetary damages.

## ARTICLE 25 - COMPLIANCE WITH FEDERAL REGULATIONS

25.1    Executive Orders. Services under this MSA may be subject to the provisions of certain executive orders, federal laws, state law and associated regulations governing performance of this MSA including, but not limited to: Executive Order 11246, Executive Order 11625, Executive Order 11701, and Executive Order 12138, Section 503 of the Rehabilitation Act of 1973 as amended and the Vietnam Era Veteran's Readjustment Assistance Act of 1974. To the extent that such executive orders, federal laws, state laws and associated regulations apply to the Services under this MSA, and only to that extent, **TNS** agrees to comply with the provisions of all such executive orders, federal laws, state laws, and associated regulations, as now in force or as may be amended in the future, including, but not limited to the following:

25.2    Equal Opportunity Employer. In accordance with 41 C.F.R.§60-1.4(a), the Parties incorporate herein by this reference the regulations and contract sections required by that section, including but not limited to, **TNS**'s agreement that it will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. **TNS** will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.

25.3    Non-Segregated Facilities. In accordance with 41 C.F.R.§60-1.8, **TNS** agrees that it does not and will not maintain or provide for its employees any facilities segregated on the basis of race, color, religion, sex or national origin at any of its establishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where such segregated facilities are maintained. The term "facilities" as used herein means waiting rooms, work areas, restaurants and other eating areas, time clocks, rest rooms, wash rooms, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees; provided, that separate or single-user restroom and necessary dressing or sleeping areas shall be provided to assure privacy between the sexes.

25.4    Affirmative Action Program. **TNS** agrees that it has developed and is maintaining an Affirmative Action Plan as required by 41 C.F.R.§60-1.4(b).

25.5    Filing. **TNS** agrees that it will file, per current instructions, complete and accurate reports on Standard Form 100 (EEo-1), or such other forms as may be required under 41 C.F.R.§60-1.7(a).

25.6    Handicapped Persons and Veterans. In accordance with 41 C.F.R.§60-250.20, and 41 C.F.R.§60-741.20, the parties incorporate herein by this reference the regulations and contract sections required by those provisions to be made a part of government contracts and subcontracts.



Contract Number XXXXXX-XXXX

25.7 <u>FCC Regulations.</u> Services furnished hereunder shall comply, to the extent applicable, with the requirements of Subpart B of Part 15 of the Federal Communication Commission's Rules and Regulations, as may be amended from time to time, including those sections concerning the labeling of Equipment and the suppression of radio frequency and electro-magnetic radiation to specified levels. Should the Equipment installed by **TNS**, despite meeting the FCC's standards as set forth above, generate harmful interference to radio communications, when used in accordance with **NSN**'s reasonable operating instructions, **TNS** shall provide to **NSN** information relating to methods of suppressing such interference. Nothing herein shall be deemed to diminish or otherwise limit **TNS**'s obligations under Article 14 *"Warranties."*

## ARTICLE 26 - AFFIRMATIVE ACTION

26.1 <u>MBE/WBE/DVBE Generally.</u> **TNS** will <u>use commercially reasonable efforts to</u> utilize MBE/WBE and DVBE firms (as defined in the paragraph 26.3) as follows: 10% annual MBE participation; 5% annual WBE participation; and 1% annual DVBE participation. These goals apply to all annual expenditures by NSN pursuant to this MSA. MBE/WBE/DVBE participation may be achieved through cost of goods content, contract specific subcontracting, or the use of value-added resellers. The participation levels identified above will be renegotiated to comply with any requirements imposed on NSN. Attached hereto as Appendix 8, *"MBE/WBE/DVBE Reporting"* is TNS's completed participation plan outlining its MBE/WBE/DVBE goals and specific and detailed plans to achieve those goals. TNS will submit an updated participation plan annually by the first week in January each year during the term of this MSA. **TNS** will submit to NSN MBE/WBE/DVBE results reports quarterly by the 15th Day preceding the close of each quarter.

26.2 <u>MBE/WBE/DVBE Cancellation Clause.</u> If **TNS** falsifies or misrepresents, or fails to report a disqualifying change in the MBE/WBE/DVBE status of any supplier or any subcontractor utilized by **TNS**; or **TNS** fails to obtain any MBE/WBE/DVBE utilization goals established by **TNS**; or **TNS** fails to cooperate in any investigation conducted by **NSN** or its designee to determine TNS's compliance with this Article 26, in addition to any other rights or remedies **NSN** may have, **TNS** shall reimburse NSN for a mutually agreed upon amount proportional to the difference between the value of Orders which should have been dedicated to MBE, WBE and DVBE firms as per paragraph 26.1 and the actual value of work performed by such firms.

| Deleted: an |
| Deleted: equivalent |

26.3 <u>MBE/WBE/DVBE Definitions:</u>

(a) For purchases under this MSA by NSN, Minority and Women Business Enterprises (MBEs/WBEs) are defined as businesses which satisfy the requirements of paragraph (b) below.

(b) MBEs/WBEs must be at least 51% owned by a minority individual or group or by one or more women (for publicly-held businesses, at least 51% of the stock must be owned by one or more of those individuals), the MBEs/WBEs' management and daily business operations must be controlled by one or more of those individuals and these individuals must be either U. S. citizens or legal aliens with permanent residence status. For the purpose of this definition, minority group members include male or female Asian Americans, Black Americans, Filipino Americans, Hispanic Americans, Native Americans (i.e., American Indians, Eskimos, Aleuts and Native Hawaiians), Polynesian Americans and multi-ethnic (i.e., any combination of MBEs and WBEs where no one specific group has a 51% ownership and control of the business, but when aggregated, the ownership and control combination meets or exceeds the 51 % rule). "Control" in this context means exercising the power to make policy decisions. "Operate" in this context means actively involved in the day-to-day management of the business and not merely acting as officers or



Contract Number XXXXXX-XXXX

directors.

(c)     For purchases under this MSA, DVBEs are defined as any business concern that satisfies the requirements of paragraph (d) below and is certified as a DVBE by a certifying agency recognized by **NSN**.

(d)     The DVBE must be (1) a non-publicly-owned enterprise at least 51 % owned by one or more disabled veterans; (2) a publicly-owned business in which at least 51% of the stock is owned by one or more disabled veterans; (3) a subsidiary which is wholly owned by a parent corporation, but only if at least 51 % of the voting stock of the parent corporation is owned by one or more disabled veterans; or (4) a joint venture in which at least 51% of the joint venture's management and control and earnings are held by one or more disabled veterans. In each case, the management and control of the daily business operations must be by one or more disabled veterans. A disabled veteran is a veteran of the military, naval or air service of the United States with a service-connected disability. "Management and control" in this context means exercising the power to make policy decisions and actively involved in the day-to-day management of the business and not merely acting as officers or directors.

(e)     Foreign-owned firms operating in the United States do not qualify as MBE/WBE/DVBE merely by virtue of being foreign-owned. They must meet all other definitions listed above to satisfy these requirements.

26.4    <u>Nomination.</u> The **TNS** shall nominate at least one person who shall be the contact point and coordinator with respect to the obligations contained in this Article 26.

## ARTICLE 27 - DISPUTE RESOLUTION

27.1    If a dispute cannot be resolved within twenty-one (21) calendar days of the date of a written notice, then any dispute shall, unless either Party elects otherwise, be finally settled by arbitration in accordance with the Commercial Arbitration Rules of American Arbitration Association. The Arbitration Panel shall be composed of three (3) arbitrators. Each Party shall select an arbitrator and the third arbitrator will be appointed according to the said Rules. The award shall be final and binding on the Parties and enforceable in any court of competent jurisdiction. The place of arbitration shall be Dallas, Texas and the proceedings shall be conducted in the English language. **NSN** may elect not to arbitrate the dispute, and if so, **NSN** may determine the city in which proceedings can be filed at its sole discretion. **TNS** may request notification of **NSN**'s election to arbitrate, and within fourteen (14) days, **NSN** shall notify **TNS** of its election and the city in which proceedings may be filed, if applicable.

> Deleted: NSN

27.2    **TNS** will continue performance, and NSN shall continue to make payments to TNS that are due and payable to TNS, during the pendency of any dispute, unless NSN terminates this MSA under Article 21, "*Term and Termination.*"

27.3    Nothing in this Article 27 shall restrict either Party from seeking injunctive or other equitable relief.

## ARTICLE 28 - GENERAL PROVISIONS

28.1    <u>Amendment.</u> This MSA cannot be amended or modified except by a written agreement duly executed by **NSN** and **TNS**.



Contract Number XXXXXX-XXXX

28.2   <u>Obligation Fulfillment.</u> **TNS** warrants that it is committed to complete fulfillment of its obligations as contained in this MSA and the applicable Appendix, Amendment and/or Attachment. Any consideration for delay from **TNS** for its failure to meet those obligations shall be due to **NSN** as outlined in Article 20. Such consideration shall not be considered a penalty. Both Parties agree that any consideration represents a reasonable pre-estimate of **NSN**'s probable loss. The remedies as set out in the MSA and the applicable Appendix, Amendment and/or Attachment shall be the remedies for default.

*Deleted: The*
*Deleted: the*
*Deleted: this MSA therein*
*Deleted: for any event that constitutes the TNS's failure to fulfill its obligations*

28.3   <u>Waiver.</u> No failure or delay of either Party in exercising its rights hereunder (including but not limited to the right to require performance of any provision of this MSA) shall be deemed to be a waiver of such rights unless expressly made in writing by the Party waiving its rights.

28.4   <u>Notices.</u> Except as otherwise specified in this MSA, all notices, requests, consents, approvals and other communications required or permitted under this MSA must be in writing and will be deemed properly given and received when delivered to the address specified below (by hand, <u>email,</u> registered mail, a nationally recognized courier or overnight delivery service such as United Parcel Service, or telecopy (confirmed by the recipient), to the telecopy number specified below:

In the case of **TNS**:

Mauricio Villalon
Director-Nokia National Account
655 North Glenville Dr.
Richardson, TX 75081
206-910-4538
Mvillallon@telns.com

*Deleted: . Name¶
Title¶
Address¶
Mobile¶
Fax¶
E-mail¶
¶
[TNS Location]¶*

With copy to:

John Dobmeier
President
655 North Glenville
Richardson, TX 75081
Mobile
Fax
E-mail: jdobmeier@telns.com

*Deleted: Name¶*
*Deleted: Title¶
Address¶*

In the case of **NSN**:

Name
Title
Address
Mobile
Fax
E-mail

With a copy to:

**Nokia Siemens Networks** US LLC.
Name:
Attn: Director of Legal Services


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

1040 Crown Point Parkway
Suite 900
Atlanta, GA 30338
Fax:
Email:

Either Party may change its address or telecopy number for notification purposes by giving the other Party ten (10) Days' notice of the new address or telecopy number and the date upon which it will become effective.

28.5   Independent Contractors. The Parties intend to create an independent contractor relationship and nothing contained in this MSA will be construed to make either Party partners, joint ventures, principals, agents or employees of the other. No officer, director, employee, agent, affiliate, or contractor retained by TNS to perform Services will be deemed to be an employee, agent, or contractor of NSN. Neither Party will have any right, power, or authority, express or implied, to bind the other.

28.6   Counterparts. This MSA may be executed in any number of counterparts, each of which will be deemed an original, but all of which taken together will constitute one single agreement between the Parties. This MSA may be signed by facsimile, including in multiple counterparts if necessary, each of which counterpart is to be considered an original.

28.7   Construction. The recitals are incorporated herein by reference. This MSA is binding on the successors and assigns of the Parties. Each Party agrees to sign any additional documentation reasonably requested by the other Party which becomes necessary or desirable to further evidence the intent of this MSA; provided that such documentation shall not impact or otherwise alter the rights and obligations of the Parties hereunder. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this MSA or any Appendix, Amendment and/or Attachment. NSN's parent and affiliated companies are third party beneficiaries under this MSA.

28.8   Assignment. Neither Party shall assign or transfer this MSA, or any of its rights or obligations under this MSA, to any third party without the prior written consent of the other Party, which may be withheld at such Party's sole discretion except in connection with assignment to an affiliate of the assigning Party. In that case, consent will not be unreasonably withheld so long as the assigning Party remains fully responsible to the other Party for the proper fulfillment of this MSA. This MSA is binding upon the permitted successors and assigns of each Party.

28.9   Further Assurances. The Parties will, subsequent to the Effective Date, and without any additional consideration, execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this MSA; provided that such instruments or acts do not impact or otherwise alter the rights and obligations of the Parties hereunder.

28.10   Language. All communications between the Parties in connection with this MSA and provision of the Services by TNS shall be in the English language.

28.11   Survival. The provisions of Articles 14, "Warranties", Article 16, "Indemnities", Article 17, "Damages", Article 18, "Insurance", Article 20, "Delays", Article 21, "Term and Termination", Article 22, "Force Majeure", Article 23, "Intellectual Property Rights", Article 24, "Confidential Information", Article 25, "Compliance with Federal Regulations", and Article 27, "Dispute Resolution", shall remain in force notwithstanding termination, cancellation or expiry of the MSA.

Deleted: ¶


Nokia Siemens
Networks

Contract Number XXXXXX-XXXX

28.12   Severability. Should any provision of this MSA be partially or totally invalidated, the balance of the provisions shall remain unaffected. It is agreed by the Parties hereto that the ineffective provision shall be replaced by a valid provision which is fair to both contracting Parties and which, as far as legally possible, most closely resembles the economic purpose of the ineffective provision.

28.13   Governing Law. This MSA is governed by and shall be interpreted in accordance with the laws of the State where the Work is performed without regard to its conflicts of law provisions.

> **Deleted:** of New York

28.14   Interpretation. The following rules of interpretation shall be applied in interpreting this MSA and any Purchase Order: (i) headings and captions are for convenience only and are not to be used in the interpretation of this MSA or any Purchase Order; (ii) as used in this MSA or any Purchase Order, the terms "include" or "including" will always be deemed to mean "including, without limitation;" (iii) consents or approvals required to be given under this MSA shall be in writing and shall not be unreasonably withheld, delayed or denied unless the MSA expressly states otherwise; and (iv) all requests under this MSA shall be reasonable. The language of this MSA shall in all cases be construed simply, as a whole and in accordance with its fair meaning and not strictly for or against any Party. The Parties agree that this MSA has been prepared jointly and has been the subject of arm's length and careful negotiation. Each Party has been given the opportunity to independently review this MSA with legal counsel and other consultants, and each Party has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions. Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this MSA, the drafting of the language of this MSA shall not be attributed to either Party.

28.15   Non-intervention. In connection with the performance of Services by **TNS** to **NSN**, **TNS** agrees not to intentionally influence, directly or indirectly, any regulatory, legislative or judicial body so as to prevent or delay the utilization of the Services by **NSN** or a Customer.

28.16   Publicity. Each Party agrees not to publish press releases or publicity matters or materials concerning this MSA or any of the Services without the other Party's prior written consent, to be given at the sole discretion of such Party, except to the extent that a disclosure is required by applicable law.

28.17   Remedies. All remedies provided for in this MSA, Appendices, Amendments and/or Attachments shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF,** this MSA has been signed by the duly authorized representatives of each Party hereto.

Signed this _____ day of _____, 2007 in _____

Advanced Technologies and Installation          Nokia Siemens Networks US LLC
Corporation d/b/a Telecom Network
Specialists

By: _____

Name: _____                                    Name: _____

Title _____                                    Title _____

                                                Witness:
                                                By: _____

                                                Kathleen Nugent
                                                Contract Manager

**Deleted:** ¶

Nokia Siemens
Networks

Contract Number XXXXXX-XXXX¶
¶

**Deleted:** Signed this 2nd day of May,
2007 in Atlanta, Georgia.¶
¶
[TNS] . Nokia Siemens Networks US
LLC, ¶
. ¶
¶

_____¶
Name: . Name:¶
¶
Title . Title:¶
¶
[TNS] . Nokia Siemens Networks US
LLC ¶

**Deleted:** __

**Deleted:** _